[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 389 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 390 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 391 
The right of the defendants to use the water power for driving the machinery of their foundry was subordinate as respects the carding and fulling mill privileges of the plaintiff, such as they really were. The single question, therefore, in the case, is, whether the plaintiff and his grantors were restricted in the use of the water to the fulling and carding business, or whether they might change such use; in other words, whether the grant of the fulling mill power, and the exception of the carding wool power, form a measure of quantity, without reference to the specific purpose for which the water was to be used. The special term held that the plaintiff was not limited to the use of the water for the particular business of carding wool, or that of a fulling mill, but that he had the right to use the quantity of water used at the fulling mill *Page 392 
and carding machine wheels which formerly were on the site of the plaintiff's foundry and machine shop, at all times, for propelling the wheel at such machine shop and foundry. The general term was opposed to this view, deeming that the plaintiff was confined to the use of the water for carding machines and a fulling mill, and could not use it for other purposes.
There is no finding of facts by the judge who tried the cause, except as to the interference of the defendants with the use by the plaintiff of a quantity of water sufficient to propel the wheels of a carding machine and fulling mill, in propelling the wheel of his machine shop and foundry, and the amount of damages sustained by such interference. The respective rights of the parties in the water power are consequently to be ascertained and determined by a reference to and construction of the grants, in connection with such extrinsic facts as are admitted by the pleadings.
In 1818, and prior thereto, William Cobb was the sole owner of the mill property and water power in question, and he had a carding machine on the property, operated by such power. In March, 1818, he granted to Samuel Nash (through whom the plaintiff derives title), of such mill property, a piece of land sufficient to build a fulling mill on, of specified dimensions, with "the privilege of water to turn said fulling mill, when the same was not wanted for carding wool." Cobb and Nash, therefore, when this deed was given, owned the entire property. Cobb had a carding machine on it, and Nash was about to erect a fulling mill, having purchased land for that purpose, and Cobb granted to him the privilege of water to operate such mill, when the water was not wanted for carding wool; that is, when it was not wanted for operating the carding machine then on the part of the premises retained by Cobb. At this time, neither the defendants nor their grantors had acquired any interest or right in the mill property or water power. In May of the same year, Cobb and wife conveyed to William Hanford (through whom any rights the defendants have are derived) "all the land the blacksmith's *Page 393 
shop stands on, and also the privilege of water sufficient to carry the trip-hammer in said blacksmith's shop, when the same is not wanted by the said parties of the first part, their heirs or assigns, for carding machines and fulling mill, said water to carry said trip-hammer to be taken out to the best advantage." At this point of time there were three several rights in the water. Cobb had the first and exclusive right to it, when he wanted it for carding wool; Nash had the next right, and he could exercise it only when Cobb did not want the water for carding wool, or when there should be a surplus for that purpose; and Hanford had the right to use the water only when not "wanted" by either Cobb or Nash, or when there should be a surplus over the use of both. Cobb was not limited as to time. If it should prove that he wanted the water all the time, then neither Nash nor Hanford could use more than the surplus; and if Nash should use all not wanted by Cobb, then Hanford would be without its use. Both Nash and Hanford purchased with these contingencies in view. The exclusive right in the water for carding wool did not depend on any reservation. The grants of the water to Nash and Hanford were limited, first to the former, for fulling, and then to Hanford, for his trip-hammer; and the carding wool power was excepted. It remained with Cobb with the like force and effect as if no grant had been made. In May, 1819, Cobb conveyed all his remaining interest in the mill property to John C. Ewer; and the latter, in February, 1824, conveyed the same property to Nash, by which Nash became the sole owner of the fulling mill and carding machine privileges. The rights in the water power were thus reduced to two; one belonging to Nash, who was entitled to the entire and exclusive use of the water, when wanted for fulling and carding, and the other to Hanford, who was only entitled to the water when not wanted by Nash; and this expresses the relative rights of the plaintiff and defendants, the former having succeeded to the rights of Nash, and the latter to those of Hanford. *Page 394 
The question arises, whether the original owner of the power, either in his direct grant to Nash of the right to use the water for his fulling mill, or in the exception by such owner, both in the deeds to Nash and Hanford, of the exclusive use of the power when wanted for carding wool, intended to limit or restrict the privileges granted or excepted, that of Nash to the business of a fulling mill, and his own to that of carding wool; or whether the grant and exception are to be deemed absolute as respects the right to use the water for any purpose. The latter construction is undoubtedly to be favored, if the language of the grant or exception will admit of it; and even when the construction is doubtful, that is to be preferred which would give to the grantee in the one case, and to the grantor, in the other, a right to an unrestricted, rather than to a limited, use of the quantity of water granted or excepted. (Cromwell v. Selden, 3 Comst., 253; Olmstead v. Loomis, 6 Barbour S.C., 152; Fiske v.Wilbur, 7 id., 395; Borst v. Empie, 1 Seld., 33.)
The words of the grant to Nash are: "Also the privilege of water to turn said fulling mill, when the same is not wanted for carding wool." This was, in terms, the grant of a certain quantity of water, a quantity sufficient to drive the machinery of a fulling mill; and there is nothing in the language employed to indicate, or from which it can be inferred, that it was intended to limit the privilege granted to the specific business of a fulling mill. It is to be deemed an absolute grant of the right to use a specified quantity of water for any purpose. I do not understand the defendant's counsel to deny that the language of the grant favors the construction which would give it the character of an unrestricted grant as to use. Indeed a contrary construction of similar terms in the grant to Hanford, viz.: of "water sufficient to carry the trip-hammer in said blacksmith shop," would deprive the defendants of any right to use their privilege for operating the machinery of an iron foundry.
Cobb, the owner of the water privilege, excepted from his grant to Nash and also to Hanford, the exclusive right to the *Page 395 
use of the water for carding wool; or, in other words, granted to them only the privilege of using it when it was not wanted by him for carding. The defendants claim that this exception was intended to limit and restrict the grantor's use of his own water privilege to the particular business of carding wool. But I do not understand this to be the intent or effect of the exception. It is not to be presumed that the grantor would limit the use of his own privilege; nor was it of any importance to Nash and Hanford, when they took their grants, to what use the water should be applied to which they had no claim. The argument is, that the terms of the exception indicate a particular business, and furnish no standard for the measurement of the quantity of water to be used, but leaves the grantor to use more or less, according to the requirements of such business; that in such case, as it would be impossible to say that the business was named as a measurement of quantity, the other inference is to be adopted; that it was named as limitation of use; or, in other words, the privilege cannot be held to be an unrestricted one, for the reason that the language of the exception will not admit of that construction. I do not think this is so; but that the terms of the exception itself, construed in connection with the admitted fact that, at the time the grants to Nash and Hanford were given, the grantor was operating a carding machine by the same water privilege, furnish a standard for measuring the quantity of water to be used. The terms were, "When not wanted for carding wool." Manifestly, not generally in the business of wool carding by an indefinite number of machines; that would require the whole volume of water; but when not wanted for carding wool by the machines then operated by the grantor. This is the construction put upon the language of the exception by the original grantors, both of the plaintiff and defendants, and is undoubtedly the correct one. The exception was of a sufficient quantity of water to run a carding machine. It is the policy of the law to construe all grants and exceptions of water power as absolute, and without restriction as to the use of the water, unless it clearly appears from *Page 396 
the conveyance that the contrary was intended. It does not so appear in this case in respect to the carding wool privilege reserved.
In 1824, therefore, when Nash became the owner of both privileges, he was not restricted to the use of the water for fulling or carding purposes, but had the right to use it for any purpose not requiring a greater power than was sufficient to propel the wheels of a fulling mill and carding machine. He could change the use to driving the machinery of a foundry, if he pleased, and the defendants or their grantors could not complain, as no right of theirs would be impaired thereby, if the quantity of water used was no greater than his fulling mill and carding wool privileges gave him; and this was the right to which the plaintiff succeeded. The right of the defendants' grantors, and their own, was subordinate to the right of the plaintiff and his grantor, Nash. Prior to, and at the commencement of this action, both parties had converted their water privileges to other uses than those expressed in the original conveyance; but this worked no change in their relative rights. The plaintiff was first entitled to sufficient water to propel the machinery of a fulling mill and carding machine, which he might use in propelling that of a machine shop; whilst the defendants might take water from the dam or pond, to drive the machinery of their foundry, provided they did not interfere with the rights of the plaintiff. The change, by the plaintiff, of the use of his water privilege, as the defendants had done themselves, gave them no authority to interfere to his injury.
I understand this to have been the view taken at the special term of the respective rights of the parties, while, on the contrary, the general term deemed the plaintiff's use of the water limited to the fulling mill and wool carding business, and ordered a new trial.
The order of the general term should be reversed, and the judgment of the special term affirmed, with costs.
BALCOM, J., took no part in the decision; all the other judges concurring,
Ordered accordingly. *Page 397