LOCH SHELDRAKE ASSOCIATES, INC., Respondent, *v.* GUSSIE EVANS, Appellant.

Third Department, March 12, 1952.

*Morris M. Oppenheim, F. Walter Bliss* and *Robert H. Ecker* for appellant.

*Lazarus I. Levine* and *Bernard L. Levine* for respondent.

FOSTER, P. J. This action involves the rights of the parties to the use of water from Loch Sheldrake Lake, between the natural low and high watermarks thereof. Plaintiff concedes the right of the defendant to the use of such water but claims that the right is limited to the use thereof for power purposes alone, in connection with a mill site located on the outlet of the

lake. The defendant on the other hand claims the right to use such water for any purpose whatsoever. The case was tried as to limited issues set forth in a stipulation between the parties pursuant to section 443 of the Civil Practice Act. Those issues covered, in varying language, the rights of user by each party. The proof consisted mostly of deeds, with oral testimony taken from two witnesses only.

The trial court made an interlocutory judgment in favor of the plaintiff and directed that any remaining issues be tried thereafter. It also made an order striking out certain oral testimony; an order denying defendant's motion to amend her answer to conform to the proof; and an order denying defendant's application to amend her answer so as to set up a defense by way of prescription. Defendant has appealed from the judgment and the orders mentioned.

Loch Sheldrake Lake is a small body of fresh water in the county of Sullivan, situated between the village of Liberty and the hamlet of Woodbourne. It lies a short distance north of the Liberty-Woodbourne State highway, which runs generally in an easterly and westerly direction. Prior to any of the significant conveyances involved in this record the lake was owned by J. Morgan Divine and members of his family. They also owned land between the lake and the highway mentioned, as well as land lying south of the highway. The outlet of the lake, known as Loch Sheldrake Stream, runs under the highway and down to the south through the land formerly owned by the Divine family.

Plaintiff has succeeded in title to the ownership of the lake. Defendant owns premises known as the Evans Hotel, which is located about a half mile south of the lake. No part of the hotel premises proper is included within the bounds of any property formerly owned by the Divines. After the hotel had been established appellant's predecessor in title did acquire from the Divine family a parcel of land along the outlet of the lake known as the Mill lot, and it is on the basis of that acquisition, and the easements contained in the deed therefor, that defendant claims the unrestricted right to the use of waters of the lake between high and low watermarks. The Mill lot, however, formed no part of the hotel property in the beginning.

For some years prior to 1918, J. Morgan Divine operated a turning mill on the Mill lot. This lot was along the outlet of the lake and about 1200 feet south of the Liberty-Woodbourne highway. Power to operate the machinery of the mill was obtained from water drawn from the lake under the highway in a south-

easterly direction across the Divine property south of the highway.

In 1918 the Divine family conveyed to one Le Roy their land south of the highway except the Mill lot. Across the parcel thus conveyed ran the pipe line which carried water to power the mill. Obviously it was necessary, if the operation of the mill was to be continued, that the Divines preserve a right to keep their pipe line across the premises conveyed. In the deed to Le Roy such a reservation was made in the following language: "Said first parties also hereby expressly except from this conveyance the right to divert the waters from the Sheldrake stream or outlet of Sheldrake Lake, which runs across the premises hereby conveyed, for the use and operation of the mill and turning shop and other manufacturing purposes on the lot herein excepted, and to convey the same through pipes or other conduits across the lands hereby conveyed where the present pipeline is located, together with the right of ingress and egress at all times for the purpose of maintaining, renewing, repairing, enlarging or otherwise operating the said pipeline, and conveying water as aforesaid to the said premises and the manufacturing or other buildings located thereon, and also the right to maintain the discharge race or pipelines from the said buildings to the said brook where the same is now located, with the same right of entry for the purposes of maintenance and repair or construction as are reserved for the aforesaid pipeline, it being understood and agreed that the said pipelines shall be maintained and operated so as to cause the least injury or damage to the property over which they are located that is consistent with the full, free and absolute use thereof, which is hereby reserved."

At the time this reservation was made the Divines still owned Loch Sheldrake Lake, and hence, of course, it was unnecessary to make any reference to the use of its waters.

The next conveyance in the order of relevance was from the Divine family to Hyman Greenspan and others (hereafter referred to as the Greenspan deed), which was made on June 15, 1919. This deed conveyed the lake, and land lying between the highway and the lake. At this time the Divines still retained the Mill lot, and J. Morgan Divine still operated a mill there. In the Greenspan deed the Divines reserved, or excepted, to themselves the right to use water from the lake in this language: "The parties of the first part hereby expressly except and reserve from this conveyance the right and privilege of damming the Sheldrake Lake or Pond and the outlet thereof, and of

impounding the waters of said Lake or Pond and raising and drawing the same, together with the right of ingress and egress for the purpose of constructing, repairing and maintaining the said dam, or any part or portion thereof, and any and all conduits, raceways or pipes connected therewith or leading therefrom, which now exist, or may hereafter be constructed. Such waters, however, shall not be drawn lower than the natural low water mark of the said Lake or Pond and they shall not be raised higher than the normal or natural high water mark of said Pond, except that in case of unusual or extraordinary flood the same may be impounded for not to exceed forty eight [48] hours at any one time.''

Through a series of mesne conveyances title to the lake subsequently became vested in the plaintiff. It is unnecessary to consider in detail those conveyances, and some mortgage foreclosures involved, because it is conceded that plaintiff succeeded to the Greenspan title, and that the reservation as to the use of water from the lake in the Greenspan deed was carried through to plaintiff's title.

Subsequently and in March, 1927, the husband of defendant acquired title to the Mill lot from the Divines, and he conveyed the same thereafter to her. The deed to her husband contained a description of the Mill lot, and gave to the grantee the right to divert waters from Sheldrake Stream, and to maintain pipes across the premises formerly conveyed to Le Roy as reserved by the Divine family in the Le Roy deed, and in the identical language used in that deed. It also gave to the grantee the right and privilege to dam Loch Sheldrake Lake and draw water therefrom between low and high watermarks in the same language set forth in the Greenspan deed. In other words the husband of defendant bought the Mill lot and the two easements.

So far as the record title is concerned the foregoing deeds pose the issues as to the rights of the parties to the use of water in the lake between high and low watermarks. There is no difficulty about the easement reserved in the Le Roy deed, since that concerned only the right to divert water from Loch Sheldrake Stream, but more importantly to lay and maintain pipes across the parcel conveyed to Le Roy. The difficulty arises as to the construction to be placed upon the reservation in the Greenspan deed, which reserved the right to use certain waters of the lake. The reservation in that deed does not mention the Mill lot, but it does mention ''pipes * * * which now exist'', and since the Divines retained no land contiguous to the lake the conclusion is inescapable that an easement appurtenant to the

Mill lot was intended. Indeed, the parties agree to this construction. They disagree as to what purposes the water reserved may be used for by the defendant, now the owner of the dominant tenement.

The oral proof indicates that prior to and after the execution of the Greenspan deed the Divine family used water from the lake not only for power to operate the turning mill or machine shop on the Mill lot but also for general farm purposes. In addition they sold water to the Evans Hotel, which was carried through a two-inch pipe line connected with a pump at the mill site. The twelve-inch main pipe line was also tapped in one place about 200 feet south of the lake for the benefit of another user. After the Evans family acquired the Mill lot the operation of the turning mill, or machine shop, was discontinued, and the water taken from the lake has since been used for hotel purposes only, with the exception of the additional tap to premises not here involved. The trial court struck out all oral testimony as to the sale of water by the Divine family prior to and subsequent to the execution of the Greenspan deed. We think this ruling was erroneous.

It is fairly well established in this State, and in many other jurisdictions, that the terms of a grant or reservation for the use of water will in all doubtful cases be construed as a limitation of quantity rather than a restriction as to use (*Cromwell* v. *Selden,* 3 N. Y. 253; *Olmsted* v. *Loomis,* 9 N. Y. 423; *Wakely* v. *Davidson,* 26 N. Y. 387; *Comstock* v. *Johnson,* 46 N. Y. 615; *Groat* v. *Moak,* 94 N. Y. 115; *Hall* v. *Sterling Iron & Ry. Co.,* 148 N. Y. 432; *Carthage Tissue Paper Mills* v. *Village of Carthage,* 200 N. Y. 1; 3 Farnham on Waters and Water Rights, § 756). No limitation as to use is to be implied unless the circumstances imperatively demand it, or the language employed evinces a clear intention to limit the use to a particular purpose, and the actual use has been uniformly consistent with such limitation (*Adams* v. *Warner,* 23 Vt. 395; *Garland* v. *Hodsdon,* 46 Me. 511; *Cummings* v. *Blanchard,* 67 N. H. 268). This principle of construction is founded largely upon public policy and constitutes an exception to the general rule that where uncertainty exists in the terms of a grant or reservation of an easement the same will be construed most strictly against the grantor.

The reservation contained in the Greenspan deed, of raising and drawing water from the lake, was drawn in general terms except as to quantity. It said nothing about the use to which the water might be put. A limitation of use may therefore only be

implied if the circumstances of the transaction between Divine and the grantee in the Greenspan deed clearly require it; or by construing this reservation as a part of the easement contained in the Le Roy deed. The latter easement however merely reserved the right to divert water from the outlet of the lake, and to maintain pipe lines across the premises conveyed to Le Roy for the purpose of carrying water to the Mill lot and the manufacturing or other buildings located thereon. Although the reservation contained in the Greenspan deed was undoubtedly intended to be an appurtenant to the Mill lot, it by no means follows that the use of water from the lake was thereby limited by implication to the purposes specified in the easement reserved in the Le Roy deed. Facts revealed by oral testimony do not lead to the conclusion that such a limitation by implication was intended. The Divines were not bound by the language of a separate easement, created by a different deed, and for a different purpose, at a time when they could have used all the water in the lake if they so desired.

At the time the Greenspan deed was executed the Divine family were not only using water from the lake to power their mill but also using the same for general farm purposes; and, in addition, were actually selling water from the same source to the Evans Hotel. It is only reasonable to assume that they intended to reserve a right in conformity to the use they then exercised. The general language employed by them in framing the reservation for water tends to support this assertion. If inquiry had been made by Greenspan and his cograntees it would have revealed that the Divine family were not only using water from the lake to power their mill and for general farm purposes, but also selling water from the same source to the Evans Hotel. If they made such inquiry, which does not appear, they would have been bound by the existing uses of the apparent dominant tenement in the absence of an express restriction to the contrary. If they failed to make such an inquiry then they were equally bound by the general language of the reservation which expressed no limitation as to use.

It was therefore erroneous, in our judgment, to exclude from the record testimony to the effect that when the Greenspan deed was executed the Divines were selling water from the lake, via the mill site, to the Evans Hotel. And we are constrained to hold that this use, among others, was within the reservation contained in the Greenspan deed, both upon the principle of construction we have cited and the facts revealed by oral testimony. If this conclusion is correct the right of such user passed to

the Evans family when they acquired the Mill lot in 1927. Despite the fact that they ceased to operate a manufacturing establishment on the mill site their right to use the water for hotel purposes persisted. We think defendant's assertion of an exclusive right to use the water for any purpose whatsoever is perhaps too broad a claim. We hold merely that she has the right to use the water for the purposes the Divine family used the same for at the time they conveyed the lake to Greenspan and others.

In view of this conclusion we find it unnecessary to consider the question of whether defendant should have been permitted to plead a right by prescription.

The judgment should be reversed on the law and facts, and judgment directed for the defendant-appellant on the issues submitted, in conformity with our opinion herein, with costs; the order striking out certain oral testimony should be reversed on the law and facts, without costs, and such testimony reinstated; appeals from other orders are dismissed, without costs.

HEFFERNAN, BREWSTER, BERGAN and COON, JJ., concur.

Judgment reversed, on the law and facts, and judgment directed for the defendant-appellant on the issues submitted, in conformity with the opinion herein, with costs; the order striking out certain oral testimony reversed on the law and facts, without costs, and such testimony reinstated; appeals from other orders dismissed, without costs.

All findings of fact and conclusions of law inconsistent herewith are reversed.

Settle order before any Justice of this court on five days' notice. [See 279 App. Div. 958; *post,* p. 1026.]