SHULTZ et al. v. MANUFACTURERS & TRADERS TRUST CO. et al.

Eq. No. 2279 and Civil No. 182.

District Court, W. D. New York.
July 31, 1941.

See, also, D.C., 32 F.Supp. 120.

Jules C. Randal, of Buffalo, N. Y., for plaintiffs.

Babcock, Hollister, Newbury & Russ, of Buffalo, N. Y., for Manufacturers & Traders Trust Co. et al.

Rann, Brown, Sturtevant & Kelly, of Buffalo, N. Y., for defendant Chisholm et al.

Dudley, Stowe & Sawyer, of Buffalo, N. Y., for defendant Sawyer.

Larkin, Rathbone & Perry, of New York City, for defendant Eastman et al.

BURKE, District Judge.

These are actions brought by two of the three executors of the estate of Albert

B. Shultz against the Manufacturers & Traders Trust Company (herein referred to as the Bank), individually and as their co-executors, and certain of its officers and directors and persons and corporations associated with them. Albert B. Shultz was the owner of 46% of the common stock of Houde Engineering Company (herein called Houde), which company was engaged in the business of making shock absorbers for automobiles. The basis of the suits is the alleged conspiracy and fraud on the part of the Bank and certain officers and directors named as defendants, in fraudulently contriving to obtain from Albert B. Shultz and other owners of Houde stock, and ultimately securing from them by fraudulent representations, what is claimed to be an exclusive agreement of agency, by the terms of which the Bank undertook to secure from the Houde stockholders on a commission basis a purchaser for their stock at an aggregate price of not less than $4,000,000. The claim is that the Bank and its officers, having secured such an agreement, began to act, not as agents in accordance with the agreement, but to fraudulently secure such stock for itself, its officers and directors through a nominal purchaser for resale at a profit. It is alleged that the fraudulent plan was carried out by devious means to the benefit of the defendants and the stock resold at a profit. The plaintiffs seek recovery of upwards of $10,000,000. An accounting for the profits realized by the defendants is demanded. These transactions took place in 1928. The decedent died in 1932. The plaintiffs claim that the fraud was never discovered by the decedent, nor by the plaintiffs until shortly before these actions were commenced which was in 1938. The defendants deny the allegations of fraud, allege full knowledge of the transactions by the decedent and assert that the actions are barred by the Statute of Limitations.

Prior to September 25, 1928, the relationship of commercial bank and customer existed between the Bank and the Houde Engineering Company. In the Fall of 1927 the Ford Motor Company began ordering shock absorbers from Houde in large quantities. On January 20, 1928, an agreement was entered into between Ford and Houde covering the purchase of shock absorbers by Ford. This meant a large increase in business by Houde and required substantial expansion of its plant. Capital was needed. Late in December, 1927, or early in January, 1928, a survey of Houde operations was made by the Bank at the request of Houde which had for its purpose an analysis of the advantages and disadvantages of the new Ford business and setting up of a plan to secure the necessary financing. In this survey the Bank with the consent of Houde, and for the reason that new capital was to be sought, associated with itself Central Trust Company of Chicago which dealt largely in the investment business and the investment banking firm of Eastman, Dillon & Company of New York and Chicago. The survey was completed in February, 1928. The outcome of the survey was a proposal presented to the owners of Houde by Eastman, Dillon which contemplated the furnishing to Houde of $1,000,000 which was estimated as the necessary working capital. The terms of the proposal were unsatisfactory and were rejected by the owners of Houde. In January, 1928, Houde owed the Bank $150,000. The loan was increased so that in May, 1928, Houde owed the Bank $925,000. Operations with Ford were eminently successful. In July, 1928, Houde was making large reductions in its obligation to the Bank. By the end of the year it had increased its earnings so as to show a profit for the year of $1,000,000. The interest of Central Trust and Eastman, Dillon in the Houde matter continued after the rejection of the proposal of Eastman, Dillon by the Houde stockholders. During the negotiations which resulted in the proposal the Central Trust Company and Eastman, Dillon had been informed of the desire of the Houde owners to dispose of their holdings at a satisfactory price. Buffington, of Eastman, Dillon communicated with Rea, an officer of the Bank, in July, 1928, relative to a prospective customer, Timken-Detroit Axle Company. Some talk of a definite price or option took place between Rea and Buffington. Buffington was negotiating with Timken and reported to Rea interest on the part of Bendix and the Borg-Warner Company. Buffington urged Rea to secure an option on the stock. The desirability or necessity of obtaining a definite price for the stock, if the negotiations were to continue, led to a meeting on September 25, 1928, at Rea's office in the bank. On September 24, 1928, Rea had a talk with George Chisholm, a director and substantial stockholder of Houde and the financial adviser of Shultz, at which Rea told Chisholm that his ne-

gotiations had reached a point where he had to have a definite "price" or "option". Chisholm quoted Rea a price of $4,000,000 for all the stock, but said that he would have to consult the other stockholders. A meeting was arranged. Present at the September 25th meeting were Rea, George Chisholm, Dave Shultz, brother of the decedent and an officer and director of Houde, and James Scully, also a stockholder and officer of Houde. A. B. Shultz was not present. He had left Buffalo for Europe in the early part of September on business of the company. There is some dispute about the conversation that took place at this meeting, but whatever the conversation was there is no evidence that the decedent relied upon it or even knew the substance of it. The outcome of that meeting was the preparation of a written instrument by Rea. This instrument was taken that evening by Chisholm to Fisk, an attorney who had acted for the Houde Company since its formation. Fisk was at his home. He suggested certain changes in the instrument. The instrument was redrawn by Chisholm incorporating the changes suggested by Fisk and was thereafter signed. It reads as follows:

"In consideration of $1.00 receipt of which is hereby acknowledged, we the undersigned stockholders of the Houde Engineering Corporation, hereby give to Krauss & Company, for a period of thirty days from the date hereof, the right to purchase all the stock, of the Houde Engineering Corporation at a price of ($4,000,000) Four Million Dollars in total. This option can only be exercised by the payment of cash before its expiration. It is understood that the net assets of the Houde Engineering Corporation, when, as, and if this option shall be exercised will be at least equivalent to the position as set forth in its balance sheet dated August 31st, 1928, and any accrual in these net assets occurring since the close of business August 31st, 1928 shall adhere to the vendors in this option.

"Inasmuch as Krauss and Company will act as a broker in this transaction, it is also understood that in the event of the sale of said stock being consummated Krauss and Company will be entitled to a commission from the purchase price of 3%. If stockholders owning not more than a total of 265 shares of said stock, who do not sign this option, refuse to join in the sale at the price aforesaid, there shall be a reduction made in the purchase price of $1,640.19 per share for each share of said stock which the undersigned shall be unable to deliver to the purchasers. It is understood that the name of A. B. Shultz is signed hereto in pursuance of verbal authority given by him to negotiate a sale of said stock.

"A. B. Shultz, by G. H. Chisholm
"George H. Chisholm, V. Pres.
"Harry L. Chisholm, Treas.
"B. D. Shultz, Secretary
"J. N. Scully, V. P. Director."

Krauss & Company, named in the instrument, was a partnership of bank officials customarily used by the Bank in executing its commitments and may for all purposes be regarded as the Bank. After its execution the instrument was delivered to Rea. Rea wanted confirmation by A. B. Shultz of Chisholm's authority to execute the instrument in his behalf. Chisholm accordingly cabled Shultz in Paris, France, on September 28th as follows: "Looks as if sale will go through if can take prompt action. Price Four Million cash for all stock. All others have agreed. Please cable me immediately authority for me to act for you and Clare. No need hastening your return."

The following day Shultz cabled Chisholm to telephone him. The telephone connection was unsatisfactory. As a result Chisholm on October 2nd again cabled Shultz as follows:

"A. B. Shultz
"Hotel Pierre Premier
"Paris (France)

"Manufacturers Bank trying to get best price possible acting in our interests. Option four million cash minimum. Commission three per cent. Believe can effect sale now under present financial and industrial conditions which may change. We are pessimistic if delay necessary. Purchaser would buy capital stock assuming all assets and liabilities August Thirty-first. Profits since come to us in addition. We feel future competition uncertain and all agree wise to take sure thing. Any or all present organization remain if wish. Purchaser's attitude hope they stay. Please cable authority to act for you and Clare. Am afraid may lose opportunity if wait your return. Prospects Timken Bendix third party unknown.

"G. H. Chisholm."

On October 2, 1928, Shultz cabled Chisholm informing him that the "option as cabled has our approval".

After the execution of the option negotiations were continued with Buffington's prospects Timken, Bendix and Borg-Warner, each of whom declined to purchase. Independent efforts were made by Rea to interest others. He tried to interest Trico Products Company, a large manufacturer of automobile windshield wipers. Oshei, its president, was a director of the Bank. Oshei was not interested. On October 8, 1928 Rea put the proposition of the purchase of Houde stock up to the defendant Cooley. Cooley was the president and controlling stockholder of New York Car Wheel Company and a director of the Bank. Cooley was interested and made some investigation of the matter. On October 10th he met at the Bank with Harriman, its president, Wurst, executive vice-president and Rea. The testimony regarding this meeting is that Cooley said his wife was averse to his making such a large commitment and that if he should undertake the purchase he would want some protection in case of his death or disability and that the investment was too large for him to carry as a permanent one. At that meeting it was agreed that if Cooley would undertake the purchase that Harriman, Wurst and Rea would agree to take the commitment off his hands in the event of his death or disability and to form a syndicate to relieve him of a portion of Cooley's purchase, if he so elected. Harriman agreed, on behalf of the Bank, to lend Cooley the money to purchase the stock upon deposit of the Houde stock and additional collateral to secure the loan. It was agreed to reduce the undertaking to writing. This was done the following day. Cooley said that he preferred to make the purchase in the name of the New York Car Wheel Company instead of in his own name. The written memorandum was drawn accordingly and dated October 11, 1928. On the same day the Bank wrote the Houde stockholders as follows:

"October 11, 1928.
"Messrs. A. B. Shultz, George H. Chisholm, Harry Chisholm, B. D. Shultz and J. Scully:
"Dear Sirs:

"Referring to the option dated September 26, 1928, which you have given us for the purchase of all of the stock of Houde Engineering Corporation, at a price of $4,-000,000.00, we beg to advise you that we have secured as a purchaser the New York Car Wheel Company, of this city, which has agreed to purchase said stock upon the terms of our option, and has made available in our hands the sum of $4,000,000.00 therefor.

"We accordingly notify you that we elect to exercise our option as of this date, and tender you payment in full upon delivery to us of all the stock of the Houde Engineering Corporation, duly endorsed for transfer, less a possible maximum. of 265 shares, all as provided in our option. We shall be glad to suit your convenience as to time and place of delivery, and payment prior to October 25th, and suggest that you promptly arrange with us for an early closing.

"Yours very truly,
"Krauss & Company,
"By T. Cantwell."

A copy of this letter was sent to A. B. Shultz by registered mail. He received it upon his return from Europe on October 18, 1928.

A computation by auditors of the accrued earnings subsequent to August 31, 1928, as contemplated by the option, was made. Negotiations with representatives of General Motors took place immediately. Representatives of General Motors visited the Houde plant on October 12 and conferred with Harriman, Wurst, Rea and Cooley. The result of this investigation by General Motors and the conference left little prospect of a sale to General Motors. On October 13th Cooley, Harriman, Rea and Wurst met at the bank. On that occasion Cooley outlined in the form of a letter to Harriman, Wurst and Rea his intention with respect to the venture as follows:

"Buffalo, N. Y.
"October 13, 1928
"Messrs. Lewis G. Harriman,
"Perry R. Wurst,
"George P. Rea.
"Gentlemen:

"Through the agency of the Manufacturers and Traders-Peoples Trust Company, which held an option to purchase the stock of the Houde Engineering Corporation, the New York Car Wheel Company, of which I own control, has undertaken to purchase this stock at a price of approximately $4,000,000.00 in accordance with

the terms of the option held in the name of Krauss and Company.

"You individually, and personally, have undertaken to relieve the New York Car Wheel Company of this obligation to purchase, in case of my death, and you have also undertaken to refinance the Houde Engineering Corporation for me.

"Negotiations are now pending for an immediate resale of the stock of this corporation at a profit; thus obviating the necessity of any refinancing, to a subsidiary of the General Motors Corporation. These negotiations were instituted by Mr. John R. Oishei, and if they are consummated it is my intention to pay Mr. Oishei a proper sum for his services, and after the other expenses are paid, it is my intention to divide the net profit as follows:

"50% to the Manufacturers & Traders Peoples Trust Co. and Western New York Investors, Inc. jointly

"7½% Mr. Harriman

"7½% Mr. Wurst

"15% Mr. Rea

"Retaining 20% myself.

"In case this sale is not consummated, it is contemplated that an underwriting syndicate be organized, in which we shall participate individually, in which the bank and Western New York Investors, Inc., will be permitted to participate; and also such other individuals, and corporations, as we shall agree upon, including Central Trust Company of Illinois, and Eastman-Dillon and Company, who were originally interested in refinancing this corporation.

"I expect such plan of refinancing to provide that 25% of the net profits shall be retained by me and you as my associates, to be divided among us on the following basis:

"15% Mr. Harriman

"15% Mr. Wurst

"30% Mr. Rea

"40% Myself

"(Signed) F. B. Cooley."

Cooley engaged the services of the defendant Sawyer as attorney to represent him in the purchase. Sawyer was familiar with the Houde Company, having been earlier engaged by Eastman-Dillon in connection with the financing proposal made by them. Cooley was considering several plans for handling the purchase including a possible re-sale, operation of the company himself, the formation of a syndicate and possible public financing of all or part of the purchase. Sawyer incorporated a new Delaware company called Houdaille Corporation in connection with which Shultz executed an affidavit for the purpose of qualifying the company to do business in New York. Some of these plans involved a sale of a portion of the stock of this new company to Shultz. Tentative financing circulars were prepared. None of these plans materialized. Meanwhile Cooley assumed the management of the plant.

Shultz returned from Europe on October 18, 1928. He thought the company had been sold to General Motors. He was incensed at this because General Motors was a large competitor of Ford. After having been assured by the Bank that it had been sold to Cooley, he was apparently satisfied. The Scully brothers who were Houde stockholders were giving trouble with their contention that Shultz had had more stock issued to him than he was entitled to. This claim was settled by the payment by Cooley on Shultz's account of $50,000. The closing of Cooley's purchase took place on October 24, 1928. Prior thereto the stockholders had delivered their stock to the Bank in escrow. The stockholders were paid the respective amounts due them by Cooley's personal checks certified by the Bank. Shultz delivered his stock also. He received only part payment for his stock, having previously agreed with Cooley to defer the balance upon an arrangement beneficial to both from a standpoint of interest on the payment deferred. The receipt which Shultz signed when he received his check recited that payment was being made "under the terms of an option dated September 26, 1928, given to Krauss & Company". It referred to the $50,000 payment theretofore advanced by Cooley on Shultz's account for settlement of the Scully claims and further "The balance is to be paid to me on demand, except that I may be permitted to take stock of a new corporation in payment of the balance". A duplicate of this receipt was given to Shultz which contained a statement signed by Wurst on behalf of the Bank that "We undertake to see that payments are made to A. B. Shultz in accordance with the terms of the receipt, on demand".

The Bank loaned Cooley $2,500,000 to pay for the stock on October 24, 1928. In addition to the Houde stock which had already been delivered in escrow to the Bank, Cooley deposited with the Bank as col-

lateral securities having a market value in excess of $600,000.

Being unsuccessful in making a resale and plans for a public offering of the stock having come to naught, Cooley with Harriman and Wurst decided to form a syndicate to take over the entire commitment at the price paid by Cooley for the stock. A syndicate agreement was prepared and directors of the Bank were offered the right to subscribe. Many of them did. So did the Bank and its securities affiliate Western New York Investors. The agreement gave Cooley an interest of 25% of any profits that might be realized and a right to participate in the syndicate which he did to the extent of $500,000. The agreement obligated the subscribers to pay for their subscriptions on call and to pay additional pro rata amounts if the syndicate managers determined that additional working capital was needed. Neither Eastman-Dillon nor Central Trust were invited to subscribe nor did they subscribe. Shultz subscribed in the amount of $250,000. Syndicate subscriptions were procured between November 1st and November 10th or 12th. Allotments were made and subscribers were notified of the amount of their allotments by letter under date of November 14th. On November 14th negotiations for a sale of the stock to Harris, Small and Company were commenced. These negotiations terminated in a sale to Harris, Small & Company for $6,000,000 on November 20th. The subscribers to the syndicate were never called upon to pay the amounts subscribed by them nor any amount. The syndicate managers received the proceeds of the sale to Harris, Small on December 3, 1928. They paid off the Bank's loan to Cooley and other expenses of Cooley's and of the syndicate and distributed the balance as provided in the syndicate agreement. Shultz received as his portion thereof $76,-942.39. He also received from the syndicate managers the balance due him from Cooley on the sale of his stock to Cooley.

The basis of these suits is fraud practiced upon the decedent by the Bank and those defendants associated with the Bank in a general scheme, the purpose and end of which was to obtain control of the Houde stock, including decedent's, by fraudulent and deceptive means, and to resell the same at a profit for the benefit of those engaged in the general scheme. It is dependent upon the existence of an agency relationship involving fiduciary duties between the Bank and the decedent with reference to the sale of decedent's stock and the violation of that agency relationship by the Bank and its officers in acquiring an interest in the subject matter of the agency during the existence of the relationship. The plaintiffs, for proof that the decedent was deceived by the defendants into parting with his stock at the price paid, rely upon oral representations made by officers of the Bank to other stockholders immediately prior to the signing of the option to the effect that the Bank would act as agent for the stockholders, would attempt to get the highest price possible for the stock, that the price of $4,000,000 to be named in the option was a minimum price and that the Bank was interested only in the commission to be earned. They further rely upon the transmission of those oral representations to the decedent in Paris by telegram from Chisholm at the instance of the Bank and with knowledge of the substance of the telegram. They contend that the decedent, having been deceived by the contents of the telegram, was induced to enter into an agency relationship upon the basis of the representations contained in the telegram, whereby the Bank was authorized to act as decedent's agent to sell his stock upon a basis of $4,000,000 minimum for all the stock. This theory of the case would either disregard entirely the written option which was complete and explicit as to terms, price and method of payment, or at least have it considered in a comparatively unimportant light in determining the relationship of the parties.

■ Because the option gave to the Bank the right to purchase the stock and because it also referred to the Bank as a broker and provided for a commission, the instrument was held to be ambiguous. Oral testimony was admitted to resolve the ambiguity. Testimony was admitted relating to a conversation which took place the day before the option was signed. The representations relied upon by the plaintiffs rest mainly upon the testimony of Scully and Dave Shultz, decedent's brother. Their testimony was substantially the same as given by them in the minority stockholders' action when they had an interest in the outcome of the suit. The testimony relative to price, terms and what the Bank was to do in the way of selling the stock, I regard as negotiatory. Scully particularly was bargaining for a better price and at his instance the clause relating to accruals

from August 31st inuring to the benefit of the stockholders was inserted. To view the price inserted in the option as a minimum rather than a fixed. price at which the stockholders were willing to sell is inconsistent with the purpose of the meeting at which the conversation took place and with the purpose of the option itself. The option itself and the oral testimony establish that the stockholders were desirous of effecting a sale for a fixed price which was arrived at after negotiations. Any conversation which was had prior to the signing of the option relative to terms, prospects, ultimate purchaser or what would be done by the Bank in attempting to make a sale, was in a negotiatory way only and was merged in the written instrument. It was intended by the stockholders who signed the option that either the Bank itself could purchase or could secure a purchaser upon the price and terms prescribed by the option. In either event the stockholders were to receive the fixed price less the amount designated as commissions to be deducted from the purchase price. I regard the testimony of Fisk as important. After, the Bank had presented a preliminary draft of the option, it was taken by Chisholm to Fisk, who was at his home. Fisk was attorney for the Houde company and in scrutinizing the tentative instrument was acting in the interests of the stockholders. His written charge slip indicates that Dave Shultz was present with Chisholm. It is fair to assume that they must have told Fisk in a general way about the purpose of their visit. In any event, the stockholders, before signing the option had the benefit of legal advice. Fisk suggested certain changes, one of which was with reference to the value of shares which they might be unable to deliver. These he figured on a basis of a fixed price of $4,000,000. The instrument was redrawn incorporating the changes suggested by Fisk and signed by the stockholders before delivering it to the Bank. That he, as their legal adviser regarded the instrument as an option, as evidenced by the notation on his charge slip, "To conf. with Mr. Shultz and Mr. Chisholm this evening and revision of option", although not at all conclusive is significant in view of the contention that the plaintiffs now make that the stockholders themselves thought that they were entering into an agency relationship with the Bank.

■■ The relationship between Shultz and the Bank must be determined by the terms of the instrument of September 26th therein referred to as an option and the testimony admitted to resolve the ambiguity of that instrument. If Shultz did not have actual knowledge of the contents of that instrument he was chargeable with such knowledge. The letter of October 11th electing to exercise the option definitely referred to it. Shultz received this letter ·by registered mail on his return from Europe. If up to that time he had been led to believe by the exchange of telegrams while he was in Paris that the nature of the relationship was on some other basis, that letter informed him that there was an option dated September 26th and put him on notice as to what its terms were. Furthermore, when he delivered his stock to the Bank in escrow he got a receipt which specified that delivery was being made "pursuant to the terms of an option dated September 26, 1928, given to Krauss & Company". When he received his check for part payment on December 24, 1928, he signed a receipt which again specified that payment was being made "under the terms of an option dated September 26, 1928 given to Krauss & Co.". The receipt which Shultz signed was approved by Fisk acting as attorney in behalf of Houde stockholders. These circumstances establish unequivocally that Shultz knew or was chargeable with knowledge of the terms of the instrument of September 26th. The delivery of his stock and the receipt by him of the purchase price in accordance with the terms of the instrument establish ratification by him of the authority of Chisholm to execute the instrument in his behalf.

■ Plaintiffs' contention is that Shultz was deceived by the telegram sent by Chisholm into believing that the Bank was acting in Shultz's behalf as an agent in trying to get the best possible price for the stock and that the price of $4,000,000 was but a minimum price. They contend that the Bank, acting through Rea, was instrumental in the formulation and the sending of that telegram. The evidence is insufficient to establish the Bank's connection with the telegram. But even if it were, the effect of that telegram was destroyed when Shultz was informed on his return from Europe that there was a definite option dated September 26th.

. . .

The relationship between Shultz and Krauss & Company as established by the terms of the option and the oral testimony was one which involved no fiduciary duties upon the part of Krauss & Company toward Shultz or any of the stockholders. The option fixed the terms, time of payment and method of payment in complete detail. It left nothing to the discretion or judgment of Krauss & Company. The right to purchase as expressed in the first sentence of the option is inconsistent with any theory of agency. If, under an agreement between the owner of property and one engaged to sell it for the owner, the latter has no fiduciary duties, he is not an agent of the owner. Restatement, Agency, § 13, Comment b. The facts in each case must be considered in determining whether or not it is understood that the primary obligation of one party is to act for the benefit of the other. The names which the parties give to the relationship is not determinative. Restatement, Agency, § 13, Comment c. A broker employed to sell property whose duties embrace not only the finding of a purchaser but also the negotiation of the terms may accept compensation from no one except his employer and may not place himself in a position where he has an interest which might be adverse to that of his employer. In such a relationship the broker is charged with the duty of exercising his judgment and discretion in the interests of his employer. Under an arrangement where nothing is left to the judgment or discretion of the broker no such duty exists. Gracie v. Stevens, 56 App.Div. 203, 207, 67 N.Y.S. 688; Knauss v. Gottfried Krueger Brewing Co., 142 N.Y. 70, 36 N.E. 867. Under such a construction effect is given to all clauses of the option without doing violence to any. "That interpretation is favored which will make every part of a contract effective". Fleischman v. Furgueson, 223 N.Y. 235, 239, 119 N.E. 400, 401. I do not feel bound to adopt the construction placed upon the option in the Minority Stockholders Action (Shultz v. Manufacturers & Traders Trust Co., 254 App.Div. 128, 5 N.Y.S. 2d 61), for the reason that it was based upon the proof in that case which was not the same as in the case at bar.

That the stockholders regarded the instrument of September 26 as an option to purchase is demonstrated by what was done by the Bank and the stockholders. The letter of October 11th was an election by Krauss & Company as of that date to exercise the option. It was Krauss & Company that tendered payment for the stock pursuant to the terms of that letter. That was the acceptance by Krauss & Company of the offer to sell on the option terms. Thereupon Krauss & Company became obligated to pay for the stock upon the terms of the option. Its obligation under its contract was discharged when the stockholders received Cooley's checks for their stock, but the obligation to pay was Krauss & Company's, not Cooley's nor the New York Car Wheel Company's. The accrued earnings provided for in the option were computed to October 11th, the day on which the option was exercised. This is evidence that the stockholders and the Bank believed that a mutual obligation had been entered into on that date. The practical construction which the parties to an instrument place upon it is important in construing the intention of the parties. Carthage Tissue Paper Mills v. Village of Carthage, 200 N.Y. 1, 14, 93 N.E. 60. Fisk acting as attorney for the decedent in the matter of settlement of the Scully claim against decedent approved the papers in settlement of that claim. Those papers referred to an option "which option has been assigned to New York Car Wheel Company which is now the owner and holder of said option * * *". Numerous contemporary papers when no controversy existed referred to the purchase as having been made under the terms of an option. The evidence fairly demonstrates that the Bank and the stockholders, including decedent, regarded the sale to Cooley as one made under the definite terms of an option to purchase given by the stockholders to Krauss & Company and that when the option was given the stockholders intended that the price and terms fixed therein were final and definite, and that no other price or terms were to be used in attempting to negotiate a sale.

There is no proof of a conspiracy to defraud the decedent. In the summer of 1927 Central Trust Company believed that Stewart-Warner Company was a prospective purchaser for the Houde stock. Nothing came of it. Early in 1928 Eastman-Dillon and Central Trust collaborated with the Bank in submitting a financing proposal which was rejected by the Houde company. Thereafter Buffington of Eastman, Dillon attempted to find a purchaser for the Houde stock and failed. In his

negotiations he suggested that the Bank procure an option on the stock. After the sale to Cooley, Eastman, Dillon was asked to sponsor a public offering of the stock but refused. After the sale by Cooley to the syndicate, Buffington introduced Harris, Small & Company to whom the syndicate sold the stock. Eastman, Dillon and Central Trust each received from the Bank $15,000 stated to be "in appreciation of the efforts which you made to find a purchaser for this stock". When the syndicate was formed, allegedly as a part of the general fraudulent scheme, neither Central Trust nor Eastman, Dillon participated either in its formation or in the profits. When Eastman, Dillon later took part in the underwriting of the purchase by Harris, Small & Company neither Cooley nor the Bank nor its officers participated or shared in the profits.

 The sale to Cooley was a bona fide sale. He was not acting as the Bank's nominee. The Bank financed his purchase of the stock but upon Cooley's obligation evidenced by his promissory note secured by the Houde stock and other collateral having a market value of upwards of $600,000. The decedent knew that the Bank was financing Cooley's purchase. The sale to Cooley was not made until unsuccessful efforts had been made to sell to Bendix, Timken, Borg-Warner and Trico Products. When the syndicate was formed there was no purchaser for the stock in sight. Those subscribing to the syndicate undertook definite financial obligations to pay for their allotments. The circumstance that the sale to Harris, Small & Company was consummated before they were required to pay for their allotments did not change the character of the obligation that they assumed by subscribing to the syndicate. Each of the transactions, the sale to Cooley, the sale by Cooley to the syndicate and the sale by the syndicate to Harris, Small & Company were separate transactions, not a part of any general scheme to defraud and not attended by fraud on the part of any of the defendants. The decedent was not deceived by any representations or conduct on the part of any of the defendants either in the sale to Cooley or in any of the transactions in regard to the Houde stock.

 This is essentially an action grounded in fraud and deceit. The complaint allows no other interpretation. It charges the defendants with wilfully and unlawfully conspiring to acquire the Houde stock to cheat and defraud the decedent. It sets forth in detail the manner in which the fraud was accomplished. Moreover, it alleges that the fraud was not discovered by the decedent in his lifetime and was concealed from the plaintiffs until shortly before the institution of these suits. All the parties to the action and the Court have so regarded it from the beginning. The plaintiffs now contend that they do not need to prove fraud to entitle them to recovery, that proof of a breach of fiduciary duties without fraud entitles them to recovery of moneys received by the defendants as a result of the breach of fiduciary duties and, to the extent that this will not compensate decedent for the loss sustained, damages for the difference. A party may not allege one cause of action and recover upon another. Romeyn v. Sickles, 108 N. Y. 650, 652, 15 N.E. 698; Lamphere v. Lang, 213 N.Y. 585, 588, 108 N.E. 82; Cohen v. City Company of New York, 283 N.Y. 112, 117, 27 N.E.2d 803. Restitution of profits and liability for damages are inconsistent and rest on mutually exclusive remedies. Cf. Merry Realty Co. v. Shamokin & Hollis R. E. Co., 230 N.Y. 316, 317, 321, 130 N.E. 306. The transactions which form the basis of the complaints occurred in 1928. In so far as the plaintiffs seek to recover from the defendants the moneys they received as a result of breach of fiduciary relationship, the claim is barred by the Statute of Limitations. It rests upon an implied obligation to pay over the money received as a result of the breach of trust to the decedent to whom it belonged, and is governed by Section 48(1) of the New York Civil Practice Act. Frank v. Carlisle, 261 App.Div. 13, 23 N. Y.S.2d 849; Jno. Dunlop's Sons, Inc., v. Spurr, 285 N.Y. 333, 34 N.E.2d 344; Wechsler v. Bowman, 285 N.Y. 284, 293, 34 N.E.2d 322, 134 A.L.R. 1337. In so far as they seek to recover damages not based on fraud the claim is barred by Section 48(3).

 Plaintiffs contend that the ten years' Statute of Limitations governs the transactions. Civil Practice Act N.Y. Section 53. Their argument goes upon the ground that it was necessary to bring the actions in equity because of difficulty as to parties and because an accounting is necessary. "* * * although an equitable action may have for its object the accomplishment of the same end as one at law, and be based upon the same cause of action,

yet where the remedy sought in equity is a mere incident to the main obligation owing by the defendant, and which is a wholly legal one, the legal limitation applies, because the cause of action is substantially a legal one." Diefenthaler v. Mayor, 111 N.Y. 331, 338, 19 N.E. 48, 51. The essential character of the right sought to be enforced is legal not equitable, even though its enforcement is sought in equity by an accounting. Pollitz v. Wabash R. Co., 207 N.Y. 113, 130, 100 N.E. 721. Here, as in the Pollitz case, 207 N.Y. at page 130, 100 N.E. 721, resort is had to equitable jurisdiction for the purpose of ascertaining through an accounting the sum of damages. "The mere fact that this is an action for an accounting is not determinative of this question. When a legal and an equitable remedy exist as to the same subject-matter, the latter is under the control of the same statutory bar as the former. Rundle v. Allison, 34 N.Y. 180. * * *" Keys v. Leopold, 241 N.Y. 189, 193, 149 N.E. 828, 829. A legal right of action will not be treated as an equitable one, nor be governed by limitations applicable to equitable actions, even though brought in equity. Potter v. Walker, 276 N.Y. 15, 27, 11 N.E.2d 335. In the Potter case the ten year Statute was applied to certain directors named as defendants in two causes of action where profits sought to be recovered were alleged to have been received by corporations in which the directors were alleged to have an interest. Under the circumstances there was no legal right to recover from the directors the moneys in the hands of the corporations in which they had an interest. The Court there held (276 N.Y. at page 26, 11 N.E. 2d at page 337), "To the extent that an accounting is necessary, the right and the remedy must necessarily be of an equitable nature". Whatever recovery is sought by the plaintiffs in these suits is within the loss alleged to have been suffered by the decedent. No accounting is necessary. The limitation applicable to the remedy at law governs. Jno. Dunlop's Sons, Inc., v. Spurr, supra.

Under the limitation applicable to actions based on fraud, Section 48(5), Civil Practice Act N.Y., the actions would be barred six years from the time of the discovery of the facts constituting the fraud. The burden of showing when the facts constituting the fraud were discovered is upon the plaintiffs. Mason v. Henry, 152 N.Y. 529, 539, 46 N.E. 837; Jellife v. Thaw, 2 Cir., 67 F.2d 880. Under the plaintiff's theory the decedent was deceived by the Bank's representations into entering into an agency relationship with the Bank and then deceived by the Bank's officers into believing that they were acting in his interests in attempting to get the best price obtainable for his stock, whereas, in reality under plaintiffs' theory they were not but were secretly acting adverse to his interests in acquiring an interest in the stock for themselves. Under this theory of the case the decedent knew that the Bank was his agent. He knew that about a week after he had delivered his stock for Cooley's purchase the Bank and its officers organized a syndicate to acquire the stock from Cooley at the same price that Cooley paid for it and that the Bank and its officers were participating in the syndicate. Certainly that was enough to put the decedent on inquiry as to what the real facts were if the Bank was his agent. He knew also that the Bank was putting up the money for Cooley's purchase. He not only raised no objection but he himself participated in the purchase from Cooley by the syndicate and profited thereby. He knew of the resale by the syndicate to Harris, Small & Company and participated in the subsequent public sale of the stock of the newly organized company. The decedent was the only one who participated in all the Houde transactions. He continued his connection with the Houde company as president after the old officers of the company had resigned. After the sale to Harris, Small & Company he continued his connections both with Houde and the newly formed Michigan corporations. If he did not know all the minute details of all the transactions in regard to the Houde stock he had sufficient knowledge to put him upon inquiry. Under the circumstances he was chargeable with basic knowledge sufficient to start the Statute of Limitations running on the claim based on fraud. All that the plaintiffs can claim in the way of discovery by them of facts constituting fraud is that they acquired additional evidence of the Bank's participation in the subject matter of the agency. Knowledge of all the details constituting fraud was unnecessary to commence the Statute running. Higgins v. Crouse, 147 N.Y. 411, 415, 42 N.E. 6; Sielcken-Schwarz v. American Factors, Ltd., 265 N.Y. 239, 245, 192 N.E. 307; Talmadge v. United States Shipping Board,

2 Cir., 54 F.2d 240, 243; United States v. Christopher, 10 Cir., 71 F.2d 764.

The defendants are entitled to judgment dismissing the complaints. Submit findings and conclusions on notice.