CARTHAGE TISSUE PAPER MILLS, Respondent, *v.* VILLAGE OF
CARTHAGE et al., Respondents, and CARTHAGE ELECTRIC
LIGHT AND POWER COMPANY, Appellant.

Riparian rights — priority of rights to water power upon same
stream — construction of deeds conveying rights to such water
power to several grantees — effect of practical construction by
acts and user of adjacent owners.

The owner of a water power built a dam across a river, so situated that
the water could be used to run machinery not only on the main bank,
but also upon the banks of islands in the stream, and sold a number of
mill sites with water rights attached. He reserved, however, from all
the leases and conveyances subsequently made, the first right to use the
water for a site upon which he erected a blast furnace. The latest right
granted, that now belonging to appellant, was in the following terms:
" Together with the right to the use of water sufficient to run a grist
mill and a saw mill, the use, however, of said water to be subordinate to
the rights of prior purchasers and owners of the mills and machinery
now erected below the above-described premises." The blast furnace
was used almost continuously for purposes requiring much power and
the language of the conveyances creating the water powers was full
and clear in describing the reservation in its favor. Until about the
time this action was commenced the appellant and its grantors had
neither exercised nor asserted any claim of prior right over the water
powers. For some time prior to the trial the appellant had ceased to
use its water right and had transferred its plant to another site, while
the blast furnace property was in use all the time, but of late years not

1

for a blast furnace. This action was brought to define and limit the water rights of the various parties. *Held*, that it was the intention of the parties to the deed under which appellant has title that the use of water given by that deed should be subordinate to the rights appurtenant to the blast furnace property.

Practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great if not controlling weight, for it shows how the parties who made the contract understood it. Such a construction is presumed to be right, because it was made by the parties themselves when under the influence of conflicting interests, and this is true whether the construction is by contemporaries or their successors.

It is a general rule of construction, applicable to grants of water powers, that when the question arises whether, by a grant of a sufficient quantity of water to propel a particular kind of machinery, the terms employed are used merely to indicate the quantity of water intended to be granted, or to restrict the use of the water to the machinery specified, the former construction is to be favored when the language of the grant will admit of such construction.

The grants were with varying descriptions of the water rights and for various purposes, and except in a single instance, and then only indirectly, did the grant cover a definite quantity of water. In some cases the mill named was never erected, but the water was used for other purposes apparently with the consent of all concerned. Not one of the water powers is now used for the purpose named in the original grant. The practical construction of the parties for more than one generation in most cases, more than two in some and for a long period in all, the surrounding circumstances, the consideration for the grants, the comparative size, value and importance of the respective properties alleged to be superior or inferior in right, the environment and the apparent object of the grantor in creating the properties to aid in building up the locality, all point in the direction of an intent to determine the quantity of water to be used rather than to restrict its use to the machinery specified. The grants are construed as placing a limit upon quantity and not upon purpose.

*Carthage T. P. Mills* v. *Vil. of Carthage*, 127 App. Div. 945, affirmed.

(Argued October 25, 1910; decided November 15, 1910.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered July 31, 1908, affirming a judgment in favor of respondents herein entered upon the report of a referee.

Early in the history of the state, Le Ray de Chaumont

became the owner by letters patent of a large tract of land in the county of Jefferson, including the site where the village of Carthage now stands. At this point on the Black river there was an extensive water power which the owner wished to develop in order to increase the value of his lands and enable him to put them on the market. For this purpose, prior to 1830, he built a dam across the river at the place in question which was so situated just above two islands that the water could be used to run the machinery not only on the main bank but also on the banks of the islands. Thus he was in a position to furnish sites and power for an unusual number of mills and factories which would attract workmen and aid in building up the place. About 1830 he began to sell mill sites with water rights attached thereto and kept on until in the progress of years he and his grantees had created nine properties, each having the right to use water from the dam. He reserved, however, for his own use the largest and most valuable site, which was on the easterly bank of the river, and also reserved from the leases and conveyances subsequently made the first right to use water for the benefit of that site. There he erected a blast furnace which was the first manufactory of any kind established at the locality and which is the first of the nine properties mentioned.

The second in the order of time was created by a perpetual lease dated May 28th, 1830, which covered a mill site with the right to use "a sufficient quantity of water to carry one saw for a saw mill or three pair of grinding stones." The lessee covenanted "that no water shall be taken from the pond by virtue of this lease when not used for the purpose of driving the machinery in the said grist mill and saw mill." He also agreed "that in the course of the year 1831 he will have erected and running on the premises a grist mill equal in every respect" to one located at Great Bend, a place on the river some miles away. The reservation by the lessor for the benefit of his furnace property was as follows: "Reserving to the said party of the first part, his heirs and assigns forever, such part and quantity of the water as will or may be

necessary to carry the furnace now erected or that may be erected hereafter," etc.

Other leases and finally regular conveyances followed, the earlier from Le Ray de Chaumont and the later from his grantees of the balance unsold, covering mill sites with power and, except as stated hereafter, all with the same reservation in favor of the furnace property, but with varying descriptions of the water rights, of which the following are typical specimens : ·

" A sufficient quantity of water to carry on a machine shop * * * to be built of stone in a workmanlike manner in the year 1833 * * * 34 by 44 feet; " with a covenant that " no water shall be taken from the pond by virtue of this lease when not used for the purpose of driving the machinery in said shop."

" A sufficient quantity of water to carry on a pair of rollers to roll iron and fifteen machines to make nails ; " with a covenant that no water should be taken " when not used for the purpose of driving the machinery in said mill factory ; " and also a covenant against carrying on any distillery on the premises.

" A sufficient quantity of water for carrying on the said business of one cupola furnace ; " with a covenant not to use any water " for any other uses and purposes than that hereinbefore mentioned."

Water enough " for the purpose of running or carrying on a common double saw mill hereinafter mentioned, having two gates, two flutter wheels, two spur wheels and one bulk wheel, or a sufficient quantity * * * to run or carry other machinery * * * not to exceed in quantity the amount required for the saw mill above described ; " with a covenant not to use any water except when needed " for such purposes."

In all cases there was the usual right to declare a forfeiture if there was any breach. In some cases the mill named in the deed was never erected, but the water was used for other purposes from the beginning, apparently with the consent of all

concerned. In but one instance did the grant cover a definite quantity of water, and then only indirectly, but it could be spelled out.

When the seventh right was created in 1860 the lease covered a mill site and water "sufficient for to run an ordinary grist mill with four run of stones," subject to the rights of "the former grantees using the amount of water so secured to them, whether used for the specific purposes granted or for any other purpose." It contained the usual reservation in favor of the blast furnace, which was described as "now in a decaying state," or any furnace that might be erected in its place, or "any other machinery which may be built in place of said furnace."

All the deeds and leases, unless the deed creating the ninth property is an exception, reserved the water conveyed to prior grantees and protected their rights. The ninth right, now belonging to the Carthage Electric Light & Power Company, the sole appellant herein, was created by deed, dated Sept. 21st, 1869, which granted a mill site and the following water rights: "Together with the right to the use of water sufficient to run a grist mill and a saw mill, the use, however, of said water to be subordinate to the rights of prior purchasers and owners of the mills and machinery now erected below the above described premises." The consideration for the conveyance was the sum of $100, and no grist mill or saw mill was ever erected upon the premises, which were not used at all until 1881, nor from 1884 until 1890. This water right did not exist when the old dam was built, but was created by a new dam erected by the state in 1854 for the benefit of the Black River canal, and so located as to leave a small place, formerly covered almost entirely by the old dam, which had not before been available for a site.

This action was brought by the plaintiff, owning the first and eighth properties, against the owners of all the others to define and limit the water rights of the various parties and to enjoin the defendants from using more water than they are severally entitled to. The defendants by their answers united

in the prayer that the water rights of the respective parties should be admeasured as to quantity and settled as to priority and that all owners, except the answering defendant, should be restrained from using more than their share of the water. The action was referred to Milton H. Merwin as referee, who admeasured in cubic inches the water that each owner was entitled to, founding his judgment in that regard upon the description of the water rights in the respective deeds and the use made thereof, especially the early use, by the respective owners.   He determined the questions raised as to priority of rights in accordance with the order in which the rights were created, with no restrictions as to place or purpose.   The Carthage Electric Light & Power Company appealed to the Appellate Division and from its judgment of affirmance to this court.

*Wilbur A. Porter* for appellant.   The construction by the referee of the deed of the power owned by the appellant was erroneous. (*Blackman* v. *Striker*, 142 N. Y. 555 ; *Grafton* v. *Moir*, 130 N. Y. 470 ; *Borst* v. *Empie*, 5 N. Y. 39 ; *Craig* v. *Wells*, 11 N. Y. 315; *Mors* v. *Stanton*, 51 N. Y. 649 ; *Hill* v. *Priestly*, 52 N. Y. 635 ; *Dennison* v. *Taylor*, 15 Abb. [N. C.] 439.)   The restrictions, limitations and covenants in the original grant of the premises and power now owned by the defendant village restricted the use of the water to the purpose of driving the machinery mentioned therein. (*Cromwell* v. *Selden*, 3 N. Y. 253; *Borst* v. *Empie*, 5 N. Y. 33; *Hall* v. *S. I. Co.*, 148 N. Y. 432; *Wells* v. *Chapman*, 13 Barb. 561 ; *Deshon* v. *Porter*, 33 Me. 289; *Rockliff* v. *Rockliff*, 96 Me. 261 ; *Shed* v. *Leslie*, 22 Vt. 498 ; *Clement* v. *Gould*, 61 Vt. 573 ; *Strong* v. *Benedict*, 5 Conn. 210; *Sibley* v. *Hoar*, 4 Gray, 222 ; *Ashley* v. *Pease*, 18 Pick. 268.)   The covenants, reservations, exceptions and limitations imposed upon the use of the water are available to the defendant appellant.   (*Paggott* v. *Mason*, 1 Paige, 412; *Rutgers* v. *Hunter*, 6 Johns. Ch. 215; *Norman* v. *Wells*, 17 Wend. 136 ; *Trustees, etc.,* v. *Cowen*, 4 Paige, 510 ; *Trustees, etc.,* v.

*Lynch,* 70 N. Y. 440 ; *Trustees, etc.,* v. *Thatcher,* 87 N. Y. 311 ; *Rowland* v. *Miller,* 139 N. Y. 93.)

*Elon R. Brown* for plaintiff, respondent.  The covenants in the earlier grants of water power restricting the use of water to specific purposes are not available to the appellant. (*Cromwell* v. *Selden,* 3 N. Y. 253 ; *Fisk* v. *Wilber,* 7 Barb. 395 ; *Hall* v. *S. I. R. Co.,* 148 N. Y. 432 ; *Adams* v. *Warner,* 23 Vt. 395 ; *Borst* v. *Empie,* 5 N. Y. 33 ; *Post* v. *Weil,* 115 N. Y. 361 ; *Lawrence* v. *Whitney,* 115 N. Y. 410 ; *Klaer* v. *Ridgway,* 86 Penn. St. 529 ; *Iszard* v. *M. L. P. Co.,* 31 N. J. Eq. 511.)  The covenants in the earlier deeds of the axe factory, saw mill and grist mill property and old nail factory should not be construed to run with the land of the electric light company.  (*Gould* v. *Partridge,* 52 App. Div. 40.)

*A. E. Kilby* and *C. E. Norris* for Village of Carthage, respondent.  Appellant has no standing to raise the question of forfeiture, or misuse of water power.  (*Groat* v. *Moak,* 94 N. Y. 115.)  The restrictions in Stark's deed are not of manner of use, but quantity of water.  (*Hall* v. *Sterling I. O. Co.,* 148 N. Y. 432 ; *Cromwell* v. *Selden,* 3 N. Y. 253 ; *Olmstead* v. *Lewis,* 9 N. Y. 423 ; *Wakely* v. *Davidson,* 26 N. Y. 387 ; *Chase* v. *Traitel Marble Co.,* 66 N. Y. Supp. 29 ; *Blackman* v. *Striker,* 142 N. Y. 555 ; *Grafton* v. *Moir,* 130 N. Y. 465 ; *Groat* v. *Moak,* 94 N. Y. 115 ; *French* v. *Carhart,* 1 N. Y. 96.)

*W. B. Van Allen* for Ryther & Pringle Co. et al., respondents.

VANN, J.  No question is raised as to the admeasurement of the water by the learned referee, who discharged that difficult duty with such industry and skill as to make his judgment in that regard, at least, of lasting value to the parties and their successors in interest for all time to come.

The Carthage Electric Light & Power Company, the appellant, however, is not satisfied with the judgment of the referee upon the questions raised as to priority in the right to use water and as to the alleged restrictions of the use to particular purposes. It claims that the first, or blast furnace property, was superior in right to the next grants, seven in number, made by the patentee and his successors, and that through the deed to itself, although the last in the order of time, it became superior to the blast furnace and hence to all the others. It also claims that the covenants in the earlier grants alleged to restrict the use of water to the purposes specified inure to its benefit and justify it in demanding that the restrictions be observed. These questions are important, because in low water there is not enough to furnish all the parties their respective shares. The opinion of the referee upon these subjects is so full and satisfactory that only a brief expression of our views is required, for in the main we adopt his conclusions as well as the reasons given in their support.

The first question is founded on a single sentence in the Stevens deed, so called, dated September 21st, 1869, which created the property now belonging to the appellant. That sentence is as follows: " Together with the right to the use of water sufficient to run a grist mill and a saw mill, the use, however, of said water to be subordinate to the rights of prior purchasers and owners of the mills and machinery now erected below the above described premises."

The plaintiff, which now owns the blast furnace property, claims that by the terms of this deed there was reserved for the use of the blast furnace so much water as was necessary. to operate it. The appellant claims that there was no reservation for the use of the blast furnace in that deed, and that, therefore, it is " entitled to the first use of the waters of the river to the extent of the quantity reserved in the former grants for the use of the blast furnace." In other words, as the appellant insists, the owner of the blast furnace property sold to the appellant's grantors all its rights to the use of

water to the extent of a quantity sufficient to run a grist mill and a saw mill.

The referee found as facts that " At the time of the deed to Stevens above referred to there was an outstanding contract for the sale of the blast furnace property, originally given to Budd & Bones and by them transferred to Cole & Allen, and the furnace had been put in running order by the said vendees or their assigns and it was below the property conveyed to Stevens. It was the intention of the parties to said Stevens deed that the use of water given by that deed should be subordinate to the rights appurtenant to said blast furnace property."

By certain facts and circumstances, duly proved but too numerous to mention, the question of the intention of the parties to the Stevens deed became one of fact and the unanimous affirmance by the Appellate Division makes the finding above quoted conclusive upon that subject as well as upon the question whether the grantors of the plaintiff were " purchasers and owners " prior to the deed creating the appellant's property. The same is true as to the fact found that the plaintiff's property is below the property conveyed to Stevens, which, indeed, was not disputed. The existence of the outstanding contract, possession by the vendees and improvements made by them, made them " purchasers and owners," as held by the referee. They were the equitable owners and the vendors held the legal title in trust for them. After the contract matured they received a deed, which related back to the date of the contract and conveyed what it called for. Their possession and the exercise of acts of ownership by them placed the grantors of the appellant upon inquiry as to the nature and extent of their rights.

The blast furnace was the most important property on the river in location, size and value, while the site of the appellant was a small accretion, created by a change in the location of the dam, and granted for a consideration almost nominal. For eleven years after the conveyance to the appellant's grantors in 1869, the grantees did not use it at all and prior

to 1890 it had been utilized for only four years, using but a small quantity of water. The blast furnace was used almost continuously for purposes requiring much power and the language of the conveyances creating the water powers was full and clear in describing the reservation in its favor. Until about the time this action was commenced the appellant and its grantors had neither exercised nor asserted any claim of prior right over the other water powers. For some time prior to the trial the appellant had ceased to use its water right and had transferred its plant to another site, while the blast furnace property was in use all the time, but of late years not for a blast furnace.

As the referee said in his opinion : " There had been, however, by the reservations in the deeds up to that time (1869) a practical severance of the water right appurtenant to the blast furnace and a priority given it over all the grants. * * * The construction claimed for the clause in question might in case of low water make entirely inefficient the prior reservations to the furnace. It seems to me to be very clear that no such result was intended by the grantors, and that there was no design to give the Stevens right a preference to the furnace. * * * The blast furnace was below the premises conveyed to Stevens, and it had been placed in running order a short time before the Stevens deed. It was within the description ' the mills and machinery now erected below,' and I think was what was intended to be preferred. The surrounding circumstances clearly point to that result, and the deed should I think be so construed."

The remaining question is whether the covenants relating to the use of water in the earlier grants were intended to limit the quantity rather than to restrict the use. If the grantor meant to part with only so much water as the grantee might use for the saw mill, machine shop or other factory named, it inures to the benefit of the appellant, not on the theory that it can avail itself of the covenant, to which it is a stranger, but because that was all that was granted prior to its grant, and, therefore, its right is determined by that fact. If, how-

ever, the grantor intended that the grantee should use the water for the purpose designated, because it would help him market a great tract of land, the covenant would not limit the extent at all. The leases did not describe the water by measurement, and such description as there is could hardly be more indefinite. For instance, a machine shop, thirty by forty-four feet, to be built of stone, might be so built as to require all the water there was, which manifestly was not the intention. A " machine shop," a " saw mill," or a " grist mill," do not define with enough precision to be of much aid and something more was needed to limit the quantity. Not one of the water powers is now used for the purpose named in the original grant. The appellant's power was never used " to run a grist mill and a saw mill," in accordance with the provision in the Stevens deed.

On the face of the grants, when each is read as an entirety, doubt arises as to the meaning. To illustrate, why was the elaborate covenant "forever" against distilleries inserted, if the primary covenant had already limited the use to the machine shop named therein ? Why should the size of the building be fixed, if purpose and not quantity was in the minds of the parties ? Why should there be covenants to build, if use rather than development was the object aimed at ? Why should the grantor place a restriction by covenant upon use, from which, except in the case of a distillery, he could get no benefit, instead of upon quantity, from which the benefit is obvious ? Why should the form of the restriction be to the mill, instead of against the carrying on of some obnoxious business in the mill ? These and other questions of like character raise doubts in the mind of one who reads the deed in order to gather the intention therefrom without resorting to other considerations.

As was said in an important case : " Was that prior use to be limited to the particular kinds of machinery specified in the reservation, or were the terms employed as a mode of determining the quantity of water the prior use of which the grantor reserved to himself ? In other words, was it intended

that the grantor should be restricted, in the use of the water, to the machinery to which it was then applied, or might he, at his pleasure, apply the same quantity of water to any other machinery? It is a general rule of construction, applicable to grants of water powers, that when the question arises whether, by a grant of a sufficient quantity of water to propel a particular kind of machinery, the terms employed are used merely to indicate the quantity of water intended to be granted, or to restrict the use of the water to the machinery specified, the former construction is to be favored, when the language of the grant will admit of such construction. The grounds upon which this rule rests are twofold. *First,* it is more beneficial to the grantee, without being more onerous to the grantor, that he should be permitted to apply the water granted to any machinery he pleases, not requiring a greater amount of power than that specified in the grant. *Secondly,* it is supported by public policy. The interests of the community will generally be best promoted, by allowing an unrestricted application of the power to such machinery as will be most profitable to the owner." (*Cromwell* v. *Selden,* 3 N. Y. 253, 255.)

This case was followed and made the basis of judgment in *Olmsted* v. *Loomis* (9 N. Y. 423, 428), where it was also held that "long acquiescence may be properly regarded as a practical construction of the conveyance settled between the parties themselves, by which the right of the complainants to use the water for the purpose of driving the paper mill is established."

All the cases were carefully reviewed in *Hall* v. *Sterling Iron & Railway Co.* (148 N. Y. 432), where the rule announced in *Cromwell* v. *Selden* was adhered to. Among other things Judge HAIGHT, writing for the court, said : " It is a question of intention to be determined from the language of the grant and under the rulings of our courts if the meaning is doubtful that construction shall be given which shall best subserve the interests of the public by permitting the use of water for any legitimate purpose which the owner may desire." (p. 439.)

Such covenants are regarded by the courts as contrary to

public policy, because they tend to so shackle business as to retard development and lessen the value of property. They usually appear in ancient grants made when water power was of slight value, and could be used with profit but for few purposes. as compared with the present time. The grants ordinarily ran to purchasers who intended to erect or operate a particular kind of mill, so that the name of the mill afforded a convenient method of describing the quantity of water to be conveyed, but it was so loose that a covenant was desirable to aid in measuring the quantity. Many mills of the kind named in the grants before us, such as saw mills, grist mills and the like, can no longer be operated to any advantage owing to changed conditions, and restriction to a particular use might so incumber a valuable property.as to render it almost worthless. Hence, the courts, in the construction of such contracts, when the language is ambiguous, should be liberal to the covenantor and strict toward the covenantee. The consideration paid for the property claiming the right to restrict the use, and its value when compared with that of the property against which the alleged restriction operates, are important, for it is against reason that in making a grant for a very small consideration, the grantor intended to cripple a large, valuable and important enterprise. In the effort to discover the intention, the words of the grant should not be followed blindly, but force should be given to collateral facts and circumstances known to the parties and in the light of which they made their contract. As. was said by Judge Earl in a case resembling. the one now before us in some respects : "Construing the reservation in the light of all the circumstances existing at the time of the grant, to wit, the quantity of machinery and of water needed for its operation, the size, value and importance of the factory as compared with the grist mill, the fluctuating quantity of water in the river, which was certain to decrease as the country was cleared up, there can be no inference favorable to the contention of the defendant." (*Groat* v. *Moak*, 94 N. Y. 115, 127.)

Practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great, if not controlling weight, for it shows how the parties who made the contract understood it. If they do not know what they meant, who can know? Such a construction is presumed to be right, because it was made by the parties themselves when under the influence of conflicting interests. This is true whether the construction is by contemporaries or their successors, for it is self-interest that makes the construction valuable and safe. As we recently said : " When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning, even if as an original proposition they might have given it a different one." (*City of New York* v. *New York City Ry. Co.*, 193 N. Y. 543, 548.)

While the grants may permit, they do not require the construction contended for by the appellant, as they are by no means free from doubt when all the provisions are read together. The practical construction of the parties for more than one generation in most cases, more than two in some and for a long period in all, is directly the reverse of that contention. The surrounding circumstances, the consideration for the grants, the comparative size, value and importance of the respective properties alleged to be superior or inferior in right, the environment and the apparent object of the grantor in creating the properties to aid in building up the locality, all point in another direction. We construe the grants as placing a limit upon quantity and not upon purpose.

The judgment appealed from should be affirmed, with costs.

CULLEN, Ch. J., GRAY, HAIGHT, WILLARD BARTLETT, HISCOCK and COLLIN, JJ. concur.

Judgment affirmed.