James A. Stewart et al., Plaintiffs, *v.* Henry U. Barber, Jr., et al., Defendants.

Supreme Court, Westchester County, July 19, 1943.

*Oliver K. King* for plaintiffs.

*C. Elmer Spedick* for defendants.

Patterson, J. This is an action for a permanent injunction restraining the defendants from the use of any part of their

premises for the practice of dentistry. The premises are situated in a very high class real estate development in the village of Scarsdale, Westchester County, known as Berkley. All of the lots in the development are subject to certain common covenants and restrictions, specifically the following:

" *First.* That the premises hereby conveyed shall be used exclusively for residential purposes, and shall never be used for any manufacture, business, trade or occupation, and shall never be used in such a manner as to be a nuisance to the owners or occupants of any of the other property shown on said map, and horses, farm animals and barnyard fowls shall never be kept on the said premises.

" *Second.* That no building shall be erected on the said premises, except a private dwelling for one family only, * * * "

The defendant Henry Barber is a dentist specializing in that branch of his profession known as orthodontia, or the treatment of irregularities of the teeth.

It is conceded that Dr. Barber practices his profession on the premises. Indeed, the building erected thereon by the defendants was designed to facilitate this practice. There are two wings on either side of the central section of the dwelling, one of which is used as a garage, and the other for Dr. Barber's dental office.

Shortly after the time when the defendants commenced the erection of the dwelling, their attention was called by letter to the restrictive covenants prohibiting the use of the property for any business, trade or occupation, and stating that the practice of the profession of dentistry would violate those covenants, and insisting that they be lived up to, violation of which would result in a lawsuit.

The defendants invoked the doctrine of *ejusdem generis* as interpreting the scope and intent of the covenants.

The prohibitive words under construction are " manufacture ", " business ", " trade " or " occupation ". The rule of *ejusdem generis* is merely that when words having a specific meaning are followed by a word or phrase of general meaning, the latter is to be construed to refer to things of the same general kind or nature as referred to by the words of specific meaning. Here we have four words of general meaning. None of the four words contained in the covenants here involved has a specific meaning, and hence the rule would seem to be inapplicable and each of the four words used must be given their usual and ordinary meaning. The elementary purpose of the

doctrine of *ejusdem generis* is to aid the court in determining the true meaning and intent of the language employed. If the meaning be clear and unambiguous from the language used, there is no need for or purpose of invoking the doctrine. The canon of construction embodied in the doctrine of *ejusdem generis* is used by the court only to ascertain the intention of the parties, and it may be resorted to only where there is an ambiguity in the instrument which obscures the true intention. There is nothing ambiguous about the words " manufacture ", " business ", " trade " or " occupation ". There are other words employed in the covenants other than the specific words of restriction, on which I place more store and which are significant and helpful, namely, " that the premises hereby conveyed shall be used *exclusively* for residential purposes ". Concededly, they are not being used " exclusively " for residential purposes, but for the purpose of practicing dentistry. There is nothing ambiguous or calling for the doctrine of *ejusdem generis* in those words. They make the use about as exclusive as words can make it, namely, residential.

Concededly, the word " occupation " connotes the practice of dentistry. The New Century Dictionary defines it as that " in which one is engaged or employed; one's habitual or stated employment ". And Webster's Dictionary defines the word " occupation " as " that which occupies, or engages, the time and attention; the principal business of one's life; vocation, business."

It is not enough that the home is essentially residential in character in view of the employment of the words in the covenants " exclusively for residential purposes ". It is immaterial that the portion of the premises used for the practice of dentistry is but a small portion of the whole, and hence the building is still essentially a residence, in view of the inhibition of its use for anything except residential purposes.

I think here the word " occupation " is used as synonymous with " profession ", " vocation " or " calling " as distinct from " manufacture ", " business " or " trade ".

In spite of holdings seemingly to the contrary, I think where a physician or dentist sees his patients, or a lawyer meets his clients, at his house in a room which would normally be called his office, he thereby destroys the character of his home as a private dwelling, and it is no longer employed exclusively for residential purposes. The examination before trial discloses that an entire wing of the dwelling was especially constructed having in mind the business or profession to be practiced there

by Dr. Barber, because it consists of five rooms, including two operating rooms and a laboratory.

As the court said in *Forstmann* v. *Joray Holding Co., Inc.* (244 N. Y. 22), " While physicians often have their office in their residences, such use is not wholly consistent with an exclusive residential use. It often marks the first step in the decline of exclusiveness and the retreat of aristocracy."

While there is authority by the courts of this State that a restriction against business does not prohibit the practice of medicine, I can find no adjudication to that effect involving covenants as sweeping as those presented in the case at bar.

The interpretation placed upon the covenants by the parties themselves is significant and helpful as to what was intended thereby. The development in question originally consisted of eighty-five lots. At the time of the trial about seventy of them had been improved by the erection of homes. Many of them occupied more than one lot, so that the actual number of homes in the development was forty-eight. It further appears that there were five doctors and one dentist, other than the defendant, living in the development, and that none of these doctors nor the dentist practiced his profession in his home. One Dr. Seward attempted to secure the consent of the Berkley residents for the purpose of practicing medicine therein, but the same was refused, and Dr. Seward thereupon abandoned his plan to erect a house. It would appear that over a period of some fifteen years, or since the commencement of the development, the covenants have, been consistently construed and steadfastly enforced as prohibiting the practice of medicine or dentistry, and this by the parties to the covenants.

The courts give, and should give, great and often controlling consideration to the construction which parties to a contract have themselves placed upon it. (See *Woolsey* v. *Funke,* 121 N. Y. 87; *Foster* v. *White,* 253 App. Div. 448; *Morehouse* v. *Woodruff,* 218 N. Y. 494; *Carthage T. P. Mills* v. *Village of Carthage,* 200 N. Y. 1.)

As the court wrote in *Woolsey* v. *Funke* (*supra*): " It must at least be admitted  *  *  *  that the language is somewhat ambiguous or indefinite. Under such circumstances the practical interpretation of this agreement by both parties is a consideration of very great importance.  *  *  *  ' The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant than to see what they have done. Self interest stimulates the mind to activity and sharpens its perspicacity. Parties in such cases often claim more, but rarely less than they are entitled to.' "

In *Carthage T. P. Mills* v. *Village of Carthage* (*supra*), the court said: "Practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great, if not controlling weight, for it shows how the parties who made the contract understood it. If they do not know what they meant, who can know? * * * 'When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning, even if as an original proposition they might have given it a different one.'"

The construction here given to the covenants by the defendants themselves cannot be entirely ignored, because many months before they took title to the property they fortified themselves with a special policy of title insurance guaranteeing them against interference by injunction with the doctor's plan to practice dentistry on the premises.

The defendants ask what actual harm can come to the plaintiffs by the existence of Dr. Barber's practice compared with the damage which will be sustained by the defendants if his practice is prohibited by decree. Dr. Barber himself will probably sustain no damage in view of his insurance contract, but that is not the test. The question is what actual harm will result to the plaintiffs by a violation of the covenants. If the court should now hold that the covenants are inoperative as to the practice of dentistry, then to be consistent it would have to hold that it does not apply to similar occupations such as the practice of medicine or osteopathy, chiropractors, masseurs, podiatrists, et cetera. Such a ruling would have the inevitable result of letting down the bars and throwing this most attractive and exclusive residential section open to the influx of persons practicing the various professions or occupations as above enumerated, with the attendant signs on the buildings and lawns, and the presence of parked automobiles belonging to the various patrons receiving treatment. There would be the damage to the plaintiffs. It would be a damage to them financially by depreciating the value of their properties, and further by depriving them of the kind of surroundings in which they desire to live. It would destroy the exclusiveness of the development, and the purpose of the covenants was to keep it exclusive. They endeavored to protect themselves, by contract, from an incursion into this detachment by trade, business, profession or occupation.

The defendants plead for the court's sympathy, but they entered upon the project with their eyes fully open. As the plaintiffs argue, they might have definitely ascertained their rights in advance by means of a declaratory judgment. There their plea for sympathy would have had no place. My sympathy rather goes out to the plaintiffs who are endeavoring to retain something which they sought and which they purchased, namely, their right to live in a neighborhood from which all business, trade, profession or occupation was to be excluded.

It is my opinion that the covenants contemplated inhibition of the use of the property for any other purpose than residential, and that the carrying on of the profession or occupation of dentistry is a violation of the covenants, and therefore the plaintiffs are entitled to judgment granting them a permanent injunction prohibiting the defendants from using their premises for the purpose of the practice of dentistry.

Submit findings and judgment accordingly.