■ WALTER C. ROSE, Respondent-Appellant, v. STATE OF NEW YORK, Appellant-Respondent. (Claim No. 44349.) BINGHAMTON SAND & CRUSHED STONE CORPORATION et al., Respondents-Appellants, v. STATE OF NEW YORK, Appellant-Respondent. (Claim No. 46604.) — GABRIELLI, J. The State appeals from a judgment of the Court of Claims awarding damages to the claimants in the sum of $208,615, with interest, for the permanent appropriation, for highway purposes, of certain riparian rights and the destruction of claimants' water system, as well as the sum of $45,000, with interest, for the temporary interference with and taking of their water supply. The claimant Walter C. Rose was the owner of 20 acres of land in the Town of Chenango with river frontage of some 1,400 feet, and upon which there had been constructed several buildings for the purpose of carrying on certain business ventures dealing with the processing and sale of concrete and its components. He was also the owner, operator and sole stockholder of both of the corporate claimants. Upon this land, the claimant Binghamton Sand and Crushed Stone Corporation was engaged in the business of processing and sale of gravel, stone and sand while the claimant McIntosh Ready Mix Concrete Corporation was engaged in the business of the production and sale of ready-mix concrete, located several miles north of the City of Binghamton. These business ventures had been conducted upon this property for 30 years by claimants and their predecessors. The individual claimant being the sole owner of the corporate claimants, all parties and the court treated the claims as having a unity of interest and the claims were tried and considered together. By its appropriation, and in order to straighten the river channel and protect the new Interstate 81, as well as to obtain gravel from the river bed, the State appropriated a portion of the bed of the Chenango River, and in so doing it destroyed the claimants' existing source of water as well as access to the river along the southern half of their eastern boundary, and simultaneously placed fill along this portion of the property thus completely separating claimants' property from the river at this point and destroying the riparian rights previously enjoyed. Prior to the appropriation, claimants' requirements for water consisted of from 800,000 to 1,500,000 gallons daily which was obtained from that portion of the channel which was appropriated in fee. The water intake and discharge points for the sand and gravel plant were situated on or immediately adjacent to the portion appropriated. The State does not contest that part of the judgment which awarded damages in the sum of $45,000 for the temporary taking of the water supply and we, therefore, concern ourselves only with the State's contention that the court erred in its assessment of damages, for the permanent appropriation (1) in valuing the property based upon claimants' necessity to relocate its entire operation and; (2) adopting a "salvage value" test as to the value of the improvements after the taking; and (3) in valuing the property and improvements by the use of reproduction costs less depreciation. When it was learned that the existing source was to be destroyed, and because of the need for large amounts of water, steps were undertaken to determine whether a sufficient water supply could be otherwise had on or near the property. The record shows that the daily requirements for operating the plant consisted of an amount equal to 10% of the entire water supply of the City of Binghamton, obviously rendering any such contemplated use or scheme impractical and unfeasible. The engineering tests conducted by claimants confirmed that from an economic and engineering point of view, there would not be an adequate supply of water and the businesses were then relocated upon premises some four miles north of the former operations, where a suitable supply was located. Because of the intimate relationship between the two businesses and particularly the dependence of the ready mix operations upon the

sand and gravel business, both operations were relocated. The State does not rebut nor question the integration between the two businesses. In an effort to establish that it was not necessary to relocate the operations of the claimants, the State offered testimony to prove there were three methods by which the water supply could be reestablished. While conceding that two of the plans were unsatisfactory, it urged that a third plan, conceived after the trial had begun and which called for a system of galleries under the river, might provide an adequate supply. Of compelling interest, it appears from the evidence and as the court has found, that the State did not effectively contest the claimants' proof that such a scheme would be unworkable and, in fact, could not account for the conditions to be found when the channel and area would periodically become dry. The State further maintains that the trial court erred in failing to award damages based on the feasibility and availability of a claimed proven water supply on the claimants' property; and asserts that the court ignored the mandate laid down in *Mayes Co.* v. *State of New York* (18 N Y 2d 549) wherein the Court of Appeals remanded for a new trial on the ground that the award there made was based on the erroneous theory of the cost of another water supply when there was *uncontradicted* proof of the feasibility of drilling wells to provide an adequate supply on the subject property in that case. Here, not only was there no proof, uncontradicted or otherwise, that the drilling of any wells could replace the required water supply, but the court found upon the testimony of both the claimants and the State, that it was not feasible to thus provide a new water supply. The facts in the case at bar serve as no parallel with *Mayes* for here even the engineer produced by the State rejected consideration of cost estimates for any such system of wells by stating that any exploration or boring would be "mere speculation", despite the fact that he had the boring records of the State Department of Public Works in the general area of the improvement. There was evidence upon which the court could (and did) conclude that the plan was "extremely vague and utterly lacking in substantiating data" and additionally, that in dry periods water disappeared completely in the area thus making the proposal highly speculative. There was additional proof that even if a water supply should be found by the use of a series of wells, there would be no assurance of any continuity thereof since some municipality or other source might hit the same "acquifer" supplying claimants thereby lowering the supply below claimants' demands. While we recognize the sound basis for the rule laid down in *Mayes* v. *State of New York* (18 N Y 2d 549, 554, *supra*), that recovery may not "'be had for losses which the person injured might have prevented by reasonable effort and expenditures'", the evidence here does not reveal that either reasonable efforts or expenditures would have prevented or mitigated the found destruction of claimants' water supply. Although not seriously urged by the State, any fallacious suggestion that claimants could obtain water from the City of Binghamton was properly rejected, for the uncontradicted proof shows that the plant's needs would constitute 10% of the entire city's supply which would create a potential danger to the city's needs for the maintenance of the health and safety of its inhabitants. The trial court's determination that the appropriation destroyed claimants' water system and supply as well as the utility of the property for the purpose for which it was being used was properly made and finds adequate support in the record. In fixing the damages to the improvements, the court found that the highest and best uses therefor were the uses to which they were being put at the time of the appropriation, and fixed the damages based on the value of the buildings and improvements before the taking and the value of the improvements after the taking, based on salvage value. The State finds

fault with the court's formula arguing that its use of salvage value to a third person is erroneous in that its value should be predicated upon the salvage value to the claimant of any improvements, few in number, which were moved to the relocated property. We would first observe that such a theory of valuation would do violence to that principle of condemnation law where *market value* has always been the determining factor and not the value to the user. In the single page of its brief devoted to this argument and supportive of this theory advanced for the first time on appeal, the State cites no authority whatsoever. Of consuming interest is the fact that upon the trial the State adopted the same theory of "after value" or "salvage value" used by the claimants, as is evidenced by the testimony of the witnesses McCullough and Holcomb. Although the experts for both the claimants and the State used the term "salvage value", the record clearly shows that the testimony reflected the experts' opinions of the *market value* of the improvements concerning which they testified. In effect their testimony reflected the value of the improvements based upon what a willing purchaser would pay a willing seller. The end rule in every condemnation proceeding is that an owner is to be both charged and credited with the fair market value of the property taken from or left to him. The State by its action destroyed an operational plant and in order to arrive at a "before value", the worth or value of the plant as reflected in the total of the individual improvements as a going concern must be considered, for such a value properly contains a "going concern" or "economic whole" factor (*National Cellulose Corp.* v. *State of New York,* 292 N. Y. 438). Upon the appropriation by the State there then remained but individual items of equipment necessitating the use of market value of each, unrelated to any other item. We have held that an allowance was properly made for the "difference between the value of the machinery and equipment, excluded from the appropriation, if removed, and the value which such machinery and equipment added to the real property when used in connection therewith as a 'going concern' in full operation", on the theory that such machinery and equipment, when in the buildings, enhanced the value of the real property and permanent fixtures (*Glen & Mohawk Milk Assn.* v. *State of New York,* 2 A D 2d 95); and in reaffirming a similar rule laid down in *City of Buffalo* v. *Michael* (16 N Y 2d 88), we have observed that "since the act of condemnation forces premature removal of a fixture, the condemnor is liable when the fixture is removed by the tenant for the value of that fixture less its salvage value" (*Cooney Bros.* v. *State of New York,* 27 A D 2d 93, 97). In its determination of the damages sustained, the award of the court was well within the range of the testimony and may not be disturbed. Nor do we find merit in the State's contention that error was committed in the use of reproduction cost less depreciation. The improvements with which we are here concerned are no different in character from those considered in *Cooney Bros.* v. *State of New York* (supra); *Glen & Mohawk Milk Assn.* v. *State of New York* (supra); and *Banner Milling Co.* v. *State of New York* (240 N. Y. 533), where it was held that an improvement of this nature was considered a specialty and upon this basis, the theory adopted by the court is the acceptable method. It is amply clear that reproduction cost less depreciation was the only logical and adequate method to value the improvements and equipment here involved (*Marraro* v. *State of New York,* 12 N Y 2d 285, 297). In making its valuation of damages for these losses, the award made by the court was within the range of the testimony. The judgment appealed from makes an award for direct damages only and the absence of any finding of any enhancement in value by reason of the construction of the new Interstate Highway, if such there were, is of no moment for any offsetting benefits would apply only to con-

sequential damages. (*Matter of City of New York [Exterior Street]*, 285 N. Y. 455; *Matter of City of New York [Waterfront]*, 190 N. Y. 350; 19 N. Y. Jur., Eminent Domain, §§ 252, 253.) In any event, the State has advanced no such claim for any offset. While claimants have cross-appealed seeking an increase in the award made they do not now press this relief, and they have urged but one point to be considered. Interest on the award was fixed by the judgment at 4% prior to July 31, 1966, and at 6% thereafter. Claimants erroneously contend the entire awards should bear interest at the latter rate because of the amendment to section 16 of the State Finance Law providing for 6% in condemnation cases. In pertinent part, the section provides "that the interest to be paid by the state upon any judgment or accrued claim against the state arising from the acquisition of real property by appropriation shall not exceed six per centum per annum" (L. 1966, ch. 921, eff. Aug. 1, 1966). We can perceive no intendment that this provision ought have any retroactive effect and, in fact, any other interpretation would run counter to the general rule of nonretroactivity, for in instances such as this "the rate of interest should be that current in the periods during which the delay in payment has occurred" (*People ex rel. Emigrant Ind. Sav. Bank* v. *Sexton*, 284 N. Y. 57, 62; see, also, *O'Brien* v. *Young*, 95 N. Y. 428). In construing a statute using similar language, the court in *People ex rel. Emigrant Ind. Sav. Bank* v. *Sexton* (*supra*, p. 62) in denying retroactivity, added "Nor does the use of the word 'accrued' in describing the type of claims affected denote an intention that the statute is to be applied retroactively. The juxtaposition of the words 'accrued claim' to the word 'judgment' negatives such an interpretation". True it is that the word "accrued" appears to be in the past tense grammatically, nonetheless its use in the statute, without any qualifying expansion, is construed as descriptive and not to a time previous to the effective date of the statute. Judgment affirmed, with costs. Gibson, P. J., Reynolds, Aulisi and Gabrielli, JJ., concur in memorandum decision by Gabrielli, J.; Herlihy, J., dissents and votes to reverse and remit in a memorandum. Herlihy, J. (dissenting). I agree generally with the so-called rules relied upon by the majority. However, those rules are not necessarily absolute and are subordinate to the constitutional requirement that claimants receive "just compensation". Each case dealing with this problem must necessarily proceed upon its own facts in arriving at the appropriate award for direct and consequential damages. Where the facts establish a particular highest and best use, the so-called rules are relied upon to establish the monetary value for such use. The rules themselves are only applicable insofar as it is apparent that they arrive at the probable real value of the property in terms of dollars and cents. "Compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States* v. *Miller*, 317 U. S. 369, 373.) As to those appropriations by the State of New York made pursuant to section 30 of the Highway Law, there is no case allowing a recovery of damages where there has been no appropriation of a property interest of the claimant. Among those having a compensable property interest are owners of fixtures upon real property. Prior to *Cooney Bros.* v. *State of New York* (27 A D 2d 93) there had been no allowance for fixtures when the appropriation did not take the land upon which the fixtures were situate. In that case the majority relied upon the finding that the taking caused the removal of the fixtures due to inadequate ingress and egress after the taking for the *use* of the fixtures. The legal conclusion arrived at in *Cooney* was that when an appropriation for highway purposes causes the premature removal of fixtures, the owner may recover the difference between

the before value and the after value of said fixtures regardless of the terms of a lease. Accepting the conclusion of the majority that an owner of fixtures may recover damages where the appropriation does not take the land upon which the fixture is situate, the present case poses the further question of what the proper method of evaluating such fixtures should be both before and after the appropriation. I. The majority herein rely upon *Cooney Bros.* (*supra*) as establishing a rule that fixtures are to be valued by their reproduction and installation costs less depreciation for a before value and their salvage value as the after value. I disagree with their presumption that there is such an absolute rule. (A) As a general proposition a prospective purchaser of real property for the same use as the property is presently being put would be expected to pay the value of attached fixtures to the extent that they enhanced the value of the property for such use. A reasonable approach to such value is the reproduction and installation costs of such a fixture less such of its expected useful lifetime as has already passed. (See *United States* v. *Certain Property Located in the Borough of Manhattan*, 388 F. 2d 596.) In the present case the claimants offered testimony that a certain "Kennedy crusher", an alleged fixture, actually does not depreciate if appropriately maintained, thus factually showing an immediate exception to the general rule. As opposed to the rule of reproduction and installation costs less depreciation, it would seem unreasonable to find that a fixture could add any particular value beyond the actual costs to the claimants where such costs were incurred within a reasonable period of time before their removal and the record neither indicates anything other than an "arms length" purchase of such items nor any substantial appreciation in the market value of such fixtures. It might be possible to recapture a reproduction value by substantial overhauling of the property, but the present record contains no such evidence as to all of the fixtures. In the present case the claimant Rose purchased the fixtures and the land some two years before the appropriation of the bed of the stream and some four years before the diversion of the water for the sum of $200,000 plus separate capital outlays of some $55,000 for a total investment of $255,000. The trial court found the before value of the land and the fixtures to be $412,965 without any findings as to an increase in value and apparently in complete disregard of the $255,000 costs. The purchase of these items within four years of their evaluation for "before value" is the best evidence of their actual value in the absence of proof indicating an appreciation of such value. In any event, the purchase price should not be ignored by the trial court or this court in reaching a before value and in this case it would appear to be the best and most substantial evidence of actual and realistic values. (See *Dauernheim, Inc.* v. *State of New York*, 29 A D 2d 594; *Matter of City of New York* [*Throgs Neck Expressway*], 8 A D 2d 365, 366.) (B) As to the after value of fixtures, the facts of the case must determine the appropriate measure to be used. (See *Marraro* v. *State of New York*, 12 N Y 2d 285.) It should be noted that ordinarily the initial question of whether or not the item of property being considered has ceased being personal property will be determinative of its inclusion in the before and after values of the real property. (See *City of Buffalo* v. *Michael*, 16 N Y 2d 88, 92; cf. *Glen & Mohawk Milk Assn.* v. *State of New York*, 2 A D 2d 95, 97.) In the present record there is little probative evidence on this question. Assuming for present purposes that all of the items referred to as fixtures were factually and legally such as would pass with the land to a prospective purchaser, the record does not support a finding that "salvage value" is equivalent to "after value" for such items. In the present case there is no question as to the claimants' legal right to remove any and all of the improvements on the real property and

in fact they did remove all of the items referred to as fixtures to their new industrial location. The claimants have not shown that these items were not as usable for their industrial purpose after the appropriation as they were before the appropriation. From the record it would appear that they were as usable on either the original or new location as they were before the interference with the riparian rights. Generally salvage value becomes applicable when the item is so affixed to the real property that its removal leaves nothing but component parts (e.g. a walk-in refrigerator); or when the item is so specially designed for use on the subject premises that it has no general market value for such use. (See *City of Buffalo* v. *Michael, supra.*) The record does not disclose any destruction in whole or in part of the utility of the majority of the alleged fixtures (crushers, conveyors, vibrating screens, etc.) and also there is no showing that they were so designed as to have no general market value for their prior use. This record contains no other facts which would justify the ultimate factual conclusion that the after value of the alleged fixtures was equivalent to salvage value. There is affirmative evidence that these items continued to have their prior utility in the testimony that many of them were put into operation at the new location and therefore were not "salvaged". Absent a factual showing to the contrary, the only reasonable inference from the fact that industrial fixtures are removed from one industrial site to another industrial site where the same industry is being carried on is that such fixtures suffered no loss in utility as a result of such removal. The present record does not support the factual and legal conclusion that the after value of the alleged fixtures was equivalent to the salvage value of such items. II. It is error to disregard or make no factual findings as to the enhanced value of the subject premises as a result of the construction of the new Interstate Highway. (See *Rockaway Peninsula Corp.* v. *State of New York,* 29 A D 2d 997; *Reina* v. *State of New York,* 28 A D 2d 1198; *Brand* v. *State of New York,* 21 A D 2d 727, 728.) The fact of such enhancement is amply proven in the record by both the claimants and the State. The dollar and cents value of such enhancement must be correlated to the highest and best use of the property before and after the taking and also to the appropriation date. It is to be noted that the present case does not deal with a special or general benefit to the property as a result of the appropriation. (See *Laken Realty Corp.* v. *State of New York,* 29 A D 2d 1027.) (A) The trial court has found that the appropriation occurred in 1962 when the taking of the bed of the stream was perfected by the State, but it valued the property as of 1964 when the diversion of the water occurred. The trial court found that there was no taking of the claimants' land and although there was some question raised as to whether or not there was a taking of land, I find nothing which would require a reversal of that finding. Legally it might be held that there was no appropriation of the claimants' riparian rights until 1964. (See generally *Tiffany* v. *Town of Oyster Bay,* 234 N. Y. 15; *City of New York* v. *Wilson & Co.,* 278 N. Y. 86; *Clough* v. *State of New York,* 208 Misc. 499, app. dsmd. 2 A D 2d 648.) (B) The proof of the before value of the land on behalf of the claimants as of 1964 consisted of comparable sales of industrial use land and the opinion of the claimants' appraiser that the said value was $157,000. However, no explanation was offered to show a substantial increase for industrial use from 1960 when Rose purchased the land and no breakdown of the original purchase price as to land was offered and as noted in regard to the fixtures, the purchase price would seem the best evidence of the value of this land and the failure to make specific findings as to enhanced value for its before taking use renders review of the trial court's finding of $140,000 impossible. (C) The State offered testimony and evidence of a substantial enhancement in the value of the land for a

commercial use resulting from the new highway and the claimants admitted that the value as to their industrial use had been enhanced because of the new road. It appears that the State's appraiser suffered some confusion as to precisely when the enhanced value came into being, but the comparable sales show that this value was definite in 1964. The trial court made no findings as to the extent of the enhancement. The weight of the evidence in the present record is in favor of a commercial use value exceeding the industrial use value as of the time of the diversion of the water. The case should be remitted for proper findings and if necessary, further proof as to such enhanced value. (D) The question of the enhancement in value and the original purchase price must be related to the date of the appropriation which is not possible without a finding as to what is the date of the appropriation. The fundamental rule of condemnation — market value before and after — is basically a fair and adequate rule of appraisal, but its application cannot in this modern day be based upon medieval concepts of the taking of an old type of highway. Rather the courts are obligated in this day of superhighways to review realistically the loss to the condemnee, the gain to the sovereign, or the resulting detriments or the benefit accrued. A fair evaluation, subject to review, cannot be made by an appellate court unless the money damages in dollars for the detriments and the money damages in dollars for the benefits are set forth in detail in the court's analysis of damages. It does not require the wisdom of a judge, the skill of an attorney, the computations of an appraiser, but the every day judgment of the average man to know that the present highway systems are generally beneficial to the locality through which they pass and in a vast majority of claims, there is an accrual of special benefits to the the owner of the land taken. The claimants concede such benefits to the property for the prior specific industrial purpose and the State established by probative evidence such value for commercial use. There must be a realistic and reasonable analysis, based upon modern concepts, of all of the factors in arriving at fair compensation. III. For the reasons set forth hereinabove, the present judgment should be reversed because of legal errors. It further appears that the matter should be remitted to the trial court for a trial *de novo*. The record establishes that after the diversion of the water the claimant, albeit with some difficulty, continued to operate at the same location until he voluntarily moved to the new location purchased in 1961. It is undisputed that there was a nearby municipal water supply, together with adjacent river water — the appropriation or interference affected only half of the claimants' riparian frontage — and available subterranean water after the taking. In fact, there was a well in operation on the property at the time of the taking. Under such circumstances, it appears that the claimants have not on the present record sustained their burden of proof as to the lack of an adequate water supply after the taking. (See *Mayes Co.* v. *State of New York*, 18 N Y 2d 549.) It is to be also noted that apparently the water could have been reused after appropriate settling in the lagoons on the premises. The claimants were awarded both temporary damages and damages for the permanent appropriation. Upon the present record, there was one single diversion of water and if the appropriation occured in 1964, the award of temporary damage is inconsistent with the award of damages for a permanent appropriation. The State does not appear to question the award of temporary damage, but this part of the award must be considered in determining the over-all issue of damages raised by the State. In its present posture this case has been treated as if it were an ordinary appropriation under the Highway Law. In fact, we are dealing with the interference to a portion of the claimants' riparian rights which are legally known as an incorporeal hereditament: " Counsel for the plaintiff admits that water is not the subject of absolute ownership, but he contends that water powers, riparian

rights and hydraulic privileges are real property and the subject of partition as real property. That statement cannot be accepted without qualification. Water is not land. It is an incident to land which gives to the owner of the land certain rights and privileges in the use of the water. If it flows over his own land it is so far identified with the realty as to be a corporeal hereditament; and if the right is to use it as it flows over the lands of another it is an incorporeal hereditament. In either event the right of property in the water is usufructuary. It is not an ownership in the fluid as such, but the right to its flow for the various lawful uses to which it may be subjected. Since such an hereditament is incident to land, it naturally passed with land, and, therefore, it is properly classified as real property in the 'Real Property Law,' and in the 'Statutory Construction Law' and in the 'Tax Law.' The fact remains, however, that hereditaments and easements in real estate are often incapable of separation among co-tenants, although the nature and extent of the rights of the several parties may be judicially ascertained and defined. We need not go beyond the case at bar for an apt illustration. Here are lands owned in severalty abutting on waters in which the separate owners have riparian rights. These rights cannot be segregated as land. Flowing water in its physical condition is not capable of division in the same manner and to the same extent as land. Land can be separated into distinct parcels by boundary lines or other monuments, and can be separately used by the owners among whom it is divided. Any attempt to make such a division of waters would simply result in destroying their usefulness. None of the abutting owners have a separate or distinct title to a particular part of the waters of the outlet. Each is entitled, *per my et per tout*, to his portion of the whole volume of the stream. In the consideration of this subject we must not fall into the confusion which arises from the general statements of text writers. In Gould on Waters (Sec. 315) for instance, the learned author says that 'tenants in common of water course or other water rights may, as of right at the common law, have partition of the whole property so held, regardless of the difficulty, hardship or inconvenience resulting from so doing.' The cases cited under this paragraph disclose the danger of an unqualified acceptance of such a comprehensive declaration. *Hanson* v. *Willard* (12 Maine, 142) was a case in which the parties were tenants in common of lands on which there was a mill with its appurtenant mill privileges, and the right to a partition of the land necessarily involved the disposition of the mill and its privileges. And so in the case of *Smith* v. *Smith* (10 Paige, 470, 471), which seems to be the plaintiff's chief reliance on this appeal, the controlling facts were that a father, who was the owner of a mill pond and several mills, conveyed a separate mill to each of two sons, 'together with the equal undivided half part of the dam and the stream, pond, and pondage grounds, adjacent to the lands conveyed in severalty.' There the tenancy in common of the pond and pondage grounds was held to carry with it the right to a partition of the lands and, as an incident thereto, the regulation of the use of the water power. (To the same effect see *Miller* v. *Miller*, 13 Pick. [Mass.] 237; *Morrill* v. *Morrill*, 5 N. H. 134; *Cooper* v. *Cedar Rapids Water Power Co.*, 42 Iowa, 398; *Rohn* v. *Harris*, 130 Ill. 530.) Counsel for the plaintiff further argues that there are many decisions in this state to support his contention that this is an action for the partition of lands. He cites *Belknap* v. *Trimble* (3 Paige, 577); *Hills* v. *Dey* (14 Wend. 204); *Olmsted* v. *Loomis* (9 N. Y. 423); *Dexter Sulphite P. & P. Co.* v. *Frontenac Paper Co.* (20 Misc. Rep. 422), and *Carthage T. P. Mills* v. *Vil. of Carthage* (200 N. Y. 1). All these were suits in equity to define and regulate the uses of water powers and they are not relevant to the branch of this case now under discussion." (*Tracy Development Co.* v. *Becker*, 212 N. Y. 488, 499-501.) There are inherent questions as to whether or not the

placing of fill on the bed of the stream extinguished the riparian rights of the claimants insofar as reaching the new bed of the stream on the other side of the fill is concerned; also as to whether or not the appropriate method of awarding compensation herein would be on a business interruption basis limited by the over-all before and after value of the subject premises. The proper consideration of those questions together with such further facts as relate to enhanced values and the alleged fixtures should result in legal and factual findings which are adequate for review by this court. Upon the present record there has been an award of $208,615 together with $45,000 where there has been no appropriation of any of the claimants' land — but an interference with their riparian rights — the value of which land has substantially increased for commercial purposes and where the claimants apparently suffered no loss of business income as a result of the interference with the riparian rights, either prior to or after the relocation of the businesses. The judgment should be reversed and the case remitted to the trial court for a trial *de novo*.